**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE DENTAL SUPPLIES ANTITRUST LITIGATION | **No. 1:16-CV-00696-BMC-GRB**<br><br>**CONSOLIDATED**<br>**CLASS ACTION COMPLAINT**<br>**(ALL CASES)**<br><br>**JURY TRIAL DEMANDED** |

**CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Arnell Prato, D.D.S., P.L.L.C., d/b/a/ Down to Earth Dental ("Down to Earth Dental"), Evolution Dental Sciences, LLC ("Evolution"), Howard M. May, DDS, P.C. ("May"), Casey Nelson, D.D.S. ("Nelson"), Jim Peck, D.D.S. ("Peck"), Bernard W. Kurek, D.M.D. and Larchmont Dental Associates, P.C., (collectively, "Kurek"), Keith Schwartz, D.M.D., P.A. ("Schwartz") (collectively, "Plaintiffs"), on behalf of themselves and a proposed class (defined below) of all other similarly situated direct purchasers of dental supplies and equipment distribution services from defendants Henry Schein, Inc. ("Henry Schein"), Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco") (collectively, "Defendants"), and their non-defendant co-conspirator Burkhart Dental Supply Company, Inc. ("Burkhart") (together with Defendants, "Cartel Members"), bring this action for treble damages and injunctive relief under Section 1 of the Sherman Antitrust Act, demanding a trial by jury of all issues so triable. Plaintiffs allege the following, based upon personal knowledge as to matters relating to themselves, and upon information and belief, and documents produced in discovery in related litigation and the investigation of counsel as to all other matters:

**NATURE OF THE ACTION**

1.      Plaintiffs have purchased dental supplies and equipment directly from Defendants. Plaintiffs seek to represent a Class (defined below) of approximately 142,000 unique dental practices, orthodontic practices, and dental laboratories ("dental practices") operating within the United States, most of which are small sole-practitioner operations.

2.      Defendants are by far the three largest distributors of dental supplies and equipment in the United States. Insulated by high barriers to entry, largely created and bolstered by the

conspiracy alleged herein, Defendants have collectively accounted for between 80% and 90% of this highly concentrated market, with Henry Schein currently holding 41% of the market, Patterson 34%, and Benco 10%.

3.      This case involves a nationwide agreement not to compete on price by Henry Schein, Patterson, Benco, Burkhart, and other co-conspirators so as to be able to charge dental practices supracompetitive prices for dental supplies and equipment. The Cartel Members' overarching agreement not to compete on price had, and continues to have, three interrelated components— all three of which support the common goal of suppressing price competition so that they each could charge artificially inflated prices for dental supplies and equipment, and thereby reap supracompetitive profits. The overarching conspiracy included the following three elements:

4.      *First*, Henry Schein, Patterson, Benco, and Burkhart and other co-conspirators agreed among themselves to fix margins on dental supplies and equipment. In the words of Henry Schein Regional Manager Mark Lowery, the aim of the margin-fixing scheme was to ensure that dentists "get[] [dental products] for the same price no matter who they buy it from" so that "we all get paid," and the scope of the margin-fixing scheme ran "unanimously across the industry [for] as long as [he's] been in the dental business."

5.      *Second*, Henry Schein, Patterson, Benco, Burkhart and other co-conspirators allocated customers among themselves, agreeing not to poach one another's customers and, in support of that customer allocation agreement, agreeing not to actively recruit or poach one another's sales representatives. Because sales representatives often have relationships with customers and sometimes have the ability to bring books of business with them, the Cartel Members' "no-poach agreement" supported and bolstered the customer allocation agreement, which in turn, supported and bolstered the Cartel Members' overarching agreement not to compete on price.

6.      *Finally*, Henry Schein, Patterson, Benco, Burkhart, and other co-conspirators combined to block the entry and expansion of lower-margin, lower-priced, rival dental distributors that threatened the Cartel Members' ability to charge supracompetitive prices and maintain supracompetitive profit margins. Henry Schein, Patterson, Benco, Burkhart, and other yet-unknown conspirators engaged in a concerted and collusive effort that involved threats to boycott collectively, and actual group boycotts of, dental supply and equipment manufacturers, state dental trade associations, dental practices, and other industry participants that chose to deal with or sell to lower-priced dental distributors. As a consequence of Henry Schein, Patterson, Benco, and Burkhart's substantial collective market power, the Cartel Members' threatened and actual boycotts were successful in deterring market participants from doing business with or associating with lower-priced rivals—cutting these rivals off from critical suppliers and customer bases.

7.      These successful group boycotts began in or before 2008 and include the foreclosure and impairment of nationwide dental distribution competitors as well as competitors that, but-for the group boycotts, were poised for nationwide expansion. Victims of the conspiracy have included multiple discounting distributor rivals, with a variety of business models, including entities like Amazon.com, Inc., poised to grow substantially the sale of dental supplies over the internet. As to Amazon.com, in particular, a Henry Schein employee worried in writing that it had the potential to be "a freight train that will drive down margins." The Cartel Members' group boycott also targeted entities with innovative distribution methods and business models, such as SourceOne Dental, Inc. ("SourceOne"), which offers dentists discounted dental supplies over the internet and additionally partnered with state dental associations to aggregate their members' purchasing volumes as a means to further bring down prices. Over the Class Period (defined

*infra*), the conspiracy aimed its sights at multiple rival dental distributors, whose business models involved gaining customers by undercutting the margins of the Cartel Members, including Archer & White Sales, Inc. ("Archer & White"), Dynamic Dental, and Pearson Dental Supply Co. The Cartel Members collectively threatened dental equipment and supply manufacturers that the Cartel Members would each refuse to carry, promote, or sell the manufacturers' products if the manufacturers did not force these rival distributors to raise their prices. These group boycotts have impaired dental distribution rivals, foreclosed them from competing, and removed the natural downward pressure on prices and margins that would have flowed directly from enhanced competition absent the conspiracy. One prominent industry participant observed that SourceOne, in particular, which had emerged as a major competitive threat to Cartel Members beginning in 2013, would have spread throughout the nation in a "nano-second" if not for the group boycotts.

8.      The conspiracy complained of herein has spawned private actions by at least two of Defendants' rivals—one in 2012 by Archer and White,[1] and another in 2015 by SourceOne, as well as active government investigations by the Arizona Attorney General, the Texas Attorney General, and the U.S. Federal Trade Commission. SourceOne's suit is pending in this District,[2] and specifically alleges that Defendants' group boycott has stifled its growth, allowing Defendants to charge higher prices than those that would have prevailed in a world absent the conspiracy. The Texas Attorney General's investigation has already resulted in a complaint and consent judgment against Benco, and continues against Henry Schein and Patterson.

9.      The concerted conduct alleged herein constitutes an unlawful agreement not to compete,

---

[1] *Archer and White Sales, Inc. v. Henry Schein, Inc., et al.*, 2:12-cv-00572-JRG-RSP (E.D. Tex.).
[2] *SourceOne Dental, Inc. v. Patterson Companies, Inc., et al.*, No. 15-cv-5440-BMC-GRB (E.D.N.Y.) (Cogan, J.).

and in furtherance and enforcement of that overarching agreement not to compete on price, agreements to fix margins, allocate customers, and group boycotts of entities dealing with discounting rivals who threatened to undercut Cartel Members' cartelized margins. This conduct is *per se* illegal under Section 1 of the Sherman Act. The conduct has suppressed competition, fixed, raised, and stabilized prices for dental equipment and supplies, reduced consumer choice and consumer welfare, and caused Plaintiffs and members of the proposed Class antitrust injury in the form overcharge damages flowing from the imposition of higher prices than those that would have prevailed in a market undistorted by the Cartel Members' overarching agreement not to compete on price.

## JURISDICTION AND VENUE

10.     Plaintiffs bring claims under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 as Defendants reside, transact business, committed an illegal or tortious act, have an agent, or can be found in this District and a substantial portion of the events described below have been carried out in this District.

12.     This Court has personal jurisdiction over Defendants as each distributes dental supplies and equipment within this District, enters into contracts within this District, markets its distribution offering in this District, and otherwise transacts business within this District.

## INTERSTATE COMMERCE

13.     Henry Schein operates its business from 65 distribution centers throughout the nation.

Patterson operates its business from 8 distribution centers throughout the nation. Benco operates its business from 6 distribution centers throughout the nation.

14.     These distribution centers facilitate the sale of dental supplies and equipment to dental practices nationwide, in a continuous and uninterrupted flow of commerce across state lines.

15.     As the dental supplies and equipment distribution at issue in this action are sold in interstate commerce, the price impact on dental supplies and equipment distribution flowing from Defendants' unlawful conduct has had a substantial effect upon interstate commerce.

**PARTIES**

A.     **Plaintiffs**

16.     Down to Earth Dental operates two dentist offices located in Tacoma, Washington. Throughout the Class Period defined below, Down to Earth Dental purchased dental supplies and equipment from one or more Defendants at prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

17.     Kurek operated a dental office in Mount Laurel, New Jersey. During the Class Period (defined below), Kurek purchased dental supplies and equipment from one or more Defendants at prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

18.     May operates a dentist office located in Los Gatos, California. Throughout the Class Period defined below, May purchased dental supplies and equipment from one or more Defendants at prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

19.     Peck operates a dentist office in New Braunfels, Texas. Throughout the Class Period defined below, Peck purchased dental supplies and equipment from one or more Defendants at

prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

20.     Nelson operates a dentist office in Minneapolis, Minnesota. Throughout the Class Period defined below, Nelson purchased dental supplies and equipment from one or more Defendants at prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

21.     Schwartz operates a dentist office in Coconut Creek, Florida. Throughout the Class Period defined below, Schwartz purchased dental supplies and equipment from one or more Defendants at prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

22.     Evolution operates a dental laboratory in Buffalo, NY. Throughout the Class Period defined below, Evolution purchased dental supplies and equipment from one or more Cartel Members at prices that were artificially inflated as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**B.     Defendants**

23.     Henry Schein, which is incorporated under the laws of Delaware with its headquarters in Melville, New York, is the nation's largest distributor of dental supplies and equipment.

24.     Patterson, which is incorporated under the laws of Minnesota with its headquarters in St. Paul, Minnesota, is the nation's second largest distributor of dental supplies and equipment.

25.     Benco, which is incorporated under the laws of Delaware with its headquarters in Pittston, Pennsylvania, is the nation's third largest distributor of dental supplies and equipment.

**CO-CONSPIRATORS**

26.     Various other individuals and entities not named as defendants herein—including, *inter*

*alia*, Burkhart—participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Burkhart is incorporated under the laws of Washington with its headquartered in Tacoma, Washington, with branches in Alaska, Arizona, California, Colorado, Idaho, Nevada, Oklahoma, Oregon, Texas, and Utah.

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representatives of a Class defined as follows:

> All persons or entities that purchased dental supplies and equipment from Henry Schein, Patterson, Benco, Burkhart or any combination thereof, during the period beginning August 31, 2008, until such time as the anticompetitive conduct alleged herein has ceased (the "Class Period"). Excluded from the Class are Defendants and Burkhart Dental Supply Company, Inc., their subsidiaries, affiliate entities, and employees, and all federal or state government entities or agencies.

28.     The members of the Class are so numerous that joinder is impracticable. There are tens of thousands of dental practices that directly purchased dental supplies and equipment distribution from Defendants and/or Burkhart during the Class Period.

29.     There are numerous questions of law and fact that predominate over any issues affecting individual members of the Class, including, *inter alia*:

    a.   Whether Defendants and Burkhart conspired not to compete with one another on price;

    b.   Whether Defendants and Burkhart conspired with one another to allocate the market between themselves;

    c.   Whether Defendants and Burkhart conspired with one another to fix, maintain, and/or raise the prices charged to members of the Class for dental supplies and equipment;

    d.   Whether Defendants and Burkhart conspired with one another to boycott or

threaten to boycott one or more competitors, manufacturers, trade associations, customers, or other market participants with the aim of lessening competition in the United States dental supplies and equipment distribution services market;

e.  Whether the conduct alleged herein artificially maintained, preserved, or enhanced Defendants' collective market power;

f.  Whether the conduct alleged herein constitutes a *per se* violation of the federal antitrust laws;

g.  Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for dental supplies and equipment distribution services, and the proper measure of such overcharge damages.

30.    Plaintiffs have no interests that are antagonistic to those of other or absent members of the Class, such that they can fairly and adequately represent and protect their interests.

31.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

32.    Class treatment of Plaintiffs' federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

33.    Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**DEFENDANTS POSSESS SUBSTANTIAL MARKET POWER IN THE U.S. MARKET FOR DENTAL SUPPLIES AND EQUIPMENT DISTRIBUTION SERVICES**

34.    Plaintiffs allege a *per se* illegal agreement not to compete on price, including agreements

to fix and stabilize margins and prices, agreements not to compete for customers, and agreements to boycott persons and entities that did business with dental supply distributors that discounted prices and margins. To the extent Plaintiffs' claims must proceed under the rule of reason or otherwise require the definition of a relevant market, the market relevant to Plaintiffs' claims is the United States market for dental supplies and equipment distribution services.

35.      In order to treat their patients, dental practices regularly consume dozens if not hundreds of different types of dental supplies including, *inter alia*: acrylics, adhesive agents, alloys, anesthetics, articulating products, burs, cements and liners, crown and bridge products, endodontics, implants, impression materials, instruments, pins and posts, retraction materials, rubber dam materials, waxes, infection control products, and x-ray accessories ("dental supplies"), as well as various kinds of dental equipment including, *inter alia*, imaging devices, dental chairs, and CAD/CAM systems ("dental equipment," and with dental supplies, "dental supplies and equipment").

36.      There are hundreds of dental supplies and equipment manufacturers operating within the United States and elsewhere that create the products dental practices require to treat their patients. To avoid the burden and expense associated with purchasing, processing, and receiving orders from dozens of manufacturers on a regular basis, dental practices use distributors, like Cartel Members, who stock a wide-ranging catalogue of dental manufacturers' products. Approximately 75% of all such supplies and equipment are sold through distributors like Cartel Members.

37.      Henry Schein, Patterson, Benco, and Burkhart purchase dental supplies and equipment products from dental manufacturers, warehouse them in their distribution centers, and resell and deliver them directly to dental practices like Plaintiffs, charging dental practices the products'

cost (from the manufacturer) plus distribution fees (typically set as a percentage of the cost) on top of the cost, which the Cartel Members often refer to as a "margin."

38.     Because of the burden, expense, and inefficiency associated with purchasing, processing, and receiving orders from dozens of manufacturers, purchasing directly from manufacturers is not a reasonably available substitute for purchasing through distributors. By purchasing through a distributor, dental practices can place, process, and receive fewer orders and shipments, saving both time and money compared with ordering each of the various products they need from the individual manufacturers. Moreover, manufacturers themselves lack the distribution channels necessary to efficiently, affordably, and timely provide dental practices their products. Some manufacturers do not even offer direct purchasing options, requiring dental practices to purchase those manufacturers' products through distributors like the Cartel Members. This means that dental supplies and equipment manufactures could not discipline Defendants' pricing power even if, contrary to fact, they did offer lower-cost or higher-quality direct purchasing options.

39.     At all times relevant hereto, Defendants have collectively possessed market power—that is, they maintained the ability to raise prices significantly above competitive levels profitably, without losing a commensurate number of sales—in the United States market for dental supplies and equipment distribution services.

### THE U.S. MARKET FOR DENTAL SUPPLIES AND EQUIPMENT DISTRIBUTION SERVICES IS PARTICULARLY SUSCEPTIBLE TO ANTICOMPETITIVE CONDUCT

40.     The United States dental supplies and equipment distribution services market is marked by several characteristics that both facilitate the market's susceptibility to anticompetitive conduct and bolster the Defendants' substantial market power.

41.     *First*, the market is highly concentrated. Defendants collectively occupy between 80% and 90% of the relevant market, correlating to a Herfindahl-Hirschman Index ("HHI")—a

common measure of industry concentration utilized by the United States Department of Justice and economists throughout the nation—of over 3,000. An HHI over 2,500 is considered to be a "highly concentrated" industry. This market concentration makes it easier for Henry Schein, Patterson, Benco, and Burkhart to effectuate their anticompetitive scheme and virtually impossible for direct purchasers to circumvent the effects of Cartel Members' conspiracy.

42.     *Second*, the market also has high entry barriers, largely created and bolstered by the Cartel Members' conspiracy. Crucial industry access points such as state dental associations also serve as entry barriers as those critical junctures or "choke points," which connect suppliers with customers, can be, and in fact are, manipulated by large incumbents like Defendants.

43.     *Third*, the market is characterized by relatively static demand. Faced with static or declining demand, firms *should* attempt to undercut one another's prices to steal market share from one another. However, the fear of lower prices and lower profit margins creates a greater incentive to engage in collusive anticompetitive conduct to preserve corporate profits. Demand has remained relatively consistent, particularly because insured adults and children receive routine dental care coverage and dental care demand is directly correlated with dental supplies and equipment demand. Yet, Henry Schein, Patterson, Benco, and Burkhart have consistently raised their distribution prices in near lock step year-after-year. Rising prices in a market facing static or declining demand are inconsistent with competitive equilibrium prices and demonstrate that the market has been distorted by anticompetitive conduct.

**THE CARTEL MEMBERS CONSPIRED TO FIX PRICES AND MARGINS FOR THE DISTRIBUTION OF DENTAL SUPPLIES AND EQUIPMENT**

44.     The core of the conspiracy between Henry Schein, Patterson, Benco, and Burkhart involved an overarching agreement not to compete on price so as to inflate prices artificially and maintain supracompetitive margins despite static or declining demand and competitive threats

from multiple sources, including rival nationwide distributors, the internet, and innovative distribution business models. The price dental practices pay distributors for dental supplies and equipment has two components: the distributor's acquisition cost for the product from the manufacturer, and a distribution fee or margin on top of its acquisition cost.

45.    For years, Henry Schein, Patterson, Benco, and Burkhart have agreed on the distribution fee or margin component they would charge customers. At least as far back as 2005, Henry Schein, Patterson, Benco, and Burkhart agreed to charge margins on dental supplies and equipment between 26-28%. They have, every year since 2005, raised these margins, and presently, the cartelized margins are 35% or higher.

46.    Cartel Members have orchestrated the conspiracy through private meetings at professional events, personal gatherings, text messages, phone calls, business and personnel email messages, and intermediaries, including, *e.g.*, the sales representatives and executives of dental supply and equipment manufacturers. And although there is little active recruitment among the conspirators for one another's sales representatives (as a result of a no-poaching agreement, detailed *infra*), there is substantial overlap among high level employees, with many of the conspirators' high level employees moving between and among the Cartel Members. This perpetual "revolving door" facilitates the overarching agreement not to compete on price.

47.    In furtherance of the conspiracy not to compete on price, Henry Schein, Patterson, Benco, and Burkhart also agreed to boycott and exclude lower-priced distributors that threatened their supracompetitive prices. In some cases, the conspirators gave lower-priced distributors a choice: Join the cartel and raise your prices, or we will jointly pressure dental supply and equipment manufacturers and other industry participants to cut you off. Upon information and belief, Benco and Burkhart were given such a choice, and joined the overarching conspiracy not to compete.

14

After years of concerted and oppressive boycotts at the hands of the major distributors, Archer & White and its joint venture partner, Dynamic Dental—two discount distributors that substantially undercut the Cartel Members' prices—were also given such a choice. They declined the invitation and suffered a conspiracy of retaliation from the Cartel Members as a result.

48.     Specifically, in June of 2008, reeling from the force of the Cartel Members' group boycott, alleged in more detail *infra*, Archer & White and Dynamic Dental, through sales representative Skip Pettus, met with Henry Schein's Mark Lowery ***and*** Burkhart's Jack Powers. In that meeting, Mr. Pettus learned of the Cartel Members' long-standing price fixing conspiracy. Messrs. Lowery and Bowers offered to end the group boycott of Archer & White if Archer & White and Dynamic Dental agreed to maintain margins on their sales of dental products between 32 and 34%, the then-prevailing cartelized margin.

49.     During this meeting, Mr. Lowery of Henry Schein suggested to Mr. Pettus that if Archer & White and Dynamic Dental "***took price out of the equation***, you know, you'd probably get along with – more of the local people." Mr. Lowery noted that he did not want to get beat on a sale "because of price" and that "***I'd like to think I know where – where Jack*** [of Burkhart] ***is going to come in at*** [on price]." Mr. Lowery went on that he "consider[ed] Jack a good competitor. I like Jack."

50.     Mr. Lowery continued, referencing the group boycott, "Even your vendors [manufacturers] that you do have, I think you'll get to maintain better relationships with them if you don't drop your drawers [offer low prices]," and that "if I'm not going to do it [enforce the boycott], they're going to put somebody else in my place to do it [enforce the boycott]."

51.     Urging Archer & White and Dynamic Dental to raise prices, Mr. Lowery queried, "Are you making money over there? . . . I mean, if you are making money, I—I'm going to say you

probably thought you were going to make more money than what you're making."

52.     Mr. Pettus pointedly asked what he had to do to "get along" with Defendants and

Burkhart, to "get to a professional level" or be "accepted into the market" "just like a [Burkhart]

*or a Patterson is*." Mr. Lowery responded by reiterating that Archer & White and Dynamic

Dental's low pricing, or "drawer dropping," was the problem:

> Well, you know, I think the—the big thing is—you know, it goes back to, I don't
> know that you have to necessarily *buy the market*. I don't think you do. I think,
> you know, that's the probably the number one issue for small companies. I mean,
> *that's how they start getting market share* and you know, that's—that's a way for
> them to sell a product, and *we all have the ability to drop our drawers*. You know
> we do. But, you know, I think that's—that's part of the—*the mutual respect* with
> Jack and us because *we all know* that . . . We all want to make a living. We want
> to—we all—*all are going to sell it at a—at a good price where we all get paid.*

53.     Mr. Lowery also acknowledged the existence of the margin fixing agreement, where

Defendants and Burkhart would not want to undercut one another's prices, stating: "If

[customers] are price-checking you, that's the time to drop your drawers, . . . [but] that obviously

muddies up the water . . . so, you know, *I know probably Jack* [of Burkhart] *won't do that* [drop

his drawers]. . . . I think that's just *keeping the integrity of the margins* [prices]. . . . If they want

to sell without [high] margin [prices], I'm not even going to price it out."

54.     Confirming Mr. Lowery's intentions, Mr. Pettus asked, "What I'm hearing you say from

*a company standpoint*, . . . [our] margins [have] got to be better [higher], especially on

equipment." Mr. Lowery responded, "Yeah. . . . That seems to be the Achilles heel." Mr. Pettus

confirmed: "[Our] [l]ow margins on [dental] equipment?" Mr. Lowery responded, "Yeah."

55.     Confirming Archer & White and Dynamic Dental's intention to reinsert itself as a full-

service, nationwide dealer following the successful boycott by Defendants and Burkhart, Mr.

Lowery asked: Are you, are you still trying to be a full-service dealer? . . . You've got to have

the full [line]?" Mr. Pettus answered, "I've got to have the full lines or, I - I mean . . . it doesn't

work."

56.     The conversation became more pointed. Mr. Pettus asked: "Let me just cut right to the—to the chase. . . . We've got some you know, there's indicators by—by manufacturers that there's—there's been direct talk from you and others of: Hey, *we just don't want him* [Archer & White and Dynamic Dental] *in existence*. Don't open him. Don't do whatever. *If we raise our prices, can we get relief from that?* . . . If I raise my margins on equipment to an acceptable level . . . can there be relief?" Mr. Lowery responded, "What—what we don't want to do is come across [as] dictating the price to the end user. *That will get us in a lawsuit. Guarantee it*. But you know, a couple things. *One is I think when everyone plays on the same field, it makes things a lot easier*."

57.     Despite Mr. Lowery's expression of concern during this meeting that discussing pricing was *guaranteed* to get Cartel Members into a lawsuit, that is *precisely* what he did immediately thereafter, and what he continued to do, for the remainder of the conversation.

58.     Describing his discussion with the manufacturer Dental EZ about supplying Archer & White and Dynamic Dental, Mr. Lowery recalled that his conversation was "whatever you're doing over there [with Archer & White and Dynamic Dental's margins], make sure you're doing the same thing here. Because if you're going to be off, *I'm going to know about it* and you know, *that's not going to fly*. And that's when I'll shoot that *up to corporate*. But if we're *all on the same playing field* [charging the same margins], I said, *we're cool*."

59.     Mr. Lowery continued to describe how he wanted Archer & White and Dynamic Dental to fall in line with the cartelized prices: "If we're both quoting a deal, let's make sure that *we're both getting the same thing*. . . . And you're selling it, if you're not going to be selling it, Jack [Burkhart] is going to be selling it, [or] *Patterson's going to be selling it*. . . . but *I just want to*

***make sure we're all on the same page***. . . . Will my reps continue to call on your accounts? Absolutely. Will you continue to call on mine? Absolutely. But we know that the customer is making a decision based upon who they want to do business with—***not because we're slugging it out and killing each other on margins*** [prices]."

60.     Mr. Lowery described Defendants and Burkhart as "the cool crowd," that it was "like high school" and that when Archer & White and Dynamic Dental came on the scene, "[w]e'[d] already made our friends—and you're not part of the cool crowd. We're the cool crowd."

61.     Mr. Pettus responded to the cool crowd comments, "That's why I wanted to come in today and say: Okay, what can I do to where I'm not going to have to take a step back, to where I can continue to do [business in the market]." Mr. Lowery responded that he "th[ought] you got your answer on that. . . . ***Let's play on the same field***. . . . ***We can play ball together***."

62.     Mr. Pettus queried whether "if I focus on that, if I maintain margins high, can I—I mean, can I rest assured that I—that we're," Mr. Lowery interjected with another admission of price fixing, "Let's all just, you know, have the same goal in mind . . . . So that way it takes us out of the loop as far as slugging it out [on margins], ***and the doctor gets it for the same price no matter who they buy it from***."

63.     Questioning what the "same price" was, Mr. Pettus noted, "I don't know what's good and what's bad," but before Mr. Pettus could finish, Mr. Lowery responded, "North of 32 [percent margins]." Surprised by the high number, Mr. Pettus responded, "Really?" Mr. Lowery: "Yeah."

64.     Mr. Pettus again clarified the conspirators' directions, "If I'm buying at the same as you're buying and we're going up competitively against people not against price, ***I need to be north of 32 every time***?" Mr. Lowery's response confirmed the breadth and scope of the conspiracy: "You know, ***<u>unanimously across the industry</u>***, as long as I've been in the dental

business—32—and I know guys that actually get 34 on stuff . . . but you know, generally speaking, you know, 32 is always good . . . If you get 32 . . . ***everyone is going to get paid on it***. . . . ***I think if you get down*** [to] ***28, we all don't make a lot***." Mr. Lowery reiterated the ubiquity of the agreement among the major distributors: "***that's where we play ball at***."

65.     Acknowledging the price discipline that Archer & White and Dynamic Dental would impose on Defendants and Burkhart absent the Cartel Members' illicit group boycott, Mr. Lowery acknowledged, "You know, 34? You know, if you get shopped [price checked] on [34] from Dynamic Dental, gets you—gets your head handed to you [by the customer], ***you look like an idiot***. . . . Now add those numbers up. 25 [percent margins]? I won't even freaking touch it." The propensity of customers to price check, and the fear of getting "your head handed to you" if your prices were out of line with the competition, highlights not only the competitive threat posed by distributors like Archer & White, which offered discounted margins ranging from 15% to 25% on dental supplies and equipment, but also that the Cartel Members' agreement not to compete on price would be ineffective absent the participation of the major distributors.

66.     In another conversation between Mr. Pettus and Jack Bowers of Burkhart that occurred in or about June 2008, Mr. Bowers acknowledged the illegality of the price-fixing conspiracy, saying that discussing margins makes him "uncomfortable," noting that "it's a funny country that we're living in right now, different country, with some laws and things like that, you know, about competitors getting together."

67.     Demonstrating the high level of familiarity and cooperation between these supposed competitors, Mr. Bowers described the Cartel Members' relationship with one another as follows: "I think we trust each other" and that "all of these people could—could call and ask for a favor and—and—and, you know, I don't, ***I can't even remember turning <u>one</u> of them down***."

68.     Representatives from Henry Schein, Patterson, Benco, and Burkhart told industry participants, including manufacturers, that they wanted to be on an "equal playing field" as one another and as other distributors when it comes to their own sales margins. As detailed below, Henry Schein, Patterson, Benco, and Burkhart leveraged their substantial influence over dental supply and equipment manufacturers to enforce their overarching agreement not to compete on price, jointly coercing the manufacturers to tell lower-priced rival distributors to raise their prices so that they were "in line with the competition." As recently as April 8, 2015, a Benco email reflects Benco's understanding from a manufacturer that "the competition [with Patterson for sales of that manufacturers' products] will be *fair*."

69.     A Patterson employee from 2004 until 2015 similarly confirmed the breadth and scope of the Cartel Members' overarching agreement not to compete on price. He observed that at least during the period from 2011 to 2015 in which he was responsible for dental sales for Patterson, he was not permitted to go below set minimum thresholds for his gross margins, of 32% on equipment and 28-30% on supplies, and that these thresholds were implemented on a nationwide basis. He recounts further that, during his tenure, it was known throughout Patterson's sales division that Henry Schein also would not go below 32% on equipment and he would compete, if at all, for Henry Schein business on a basis other than price. This employee was regularly informed by others within Patterson that they knew that Henry Schein would not go below a certain price. The former employee also expressed familiarity with Benco's margins.

70.     A former sales representative, who worked with Patterson and Benco, offers a similar account about the minimum margins each of his employers set. This representative worked for Patterson and then Benco from 2000 through 2014.  He learned about gross margin thresholds at both companies from his managers, at monthly sales meetings, and during training sessions, and

recalls that these thresholds were documented in handouts provided at the monthly meetings. At both companies, the minimum margins were similar during his entire 15 year tenure in the industry.

71.     On August 31, 2012, Archer & White filed its own antitrust suit against Henry Schein, certain dental manufacturers, and certain unnamed co-conspirators alleging price fixing and exclusionary group boycotting activities relating to the sale and distribution of dental equipment and supplies. Just before this suit was filed, Ben Cohen, the head of Benco—which was not named as a defendant in that lawsuit—learned that the suit was imminent.  He then called James Archer of Archer & White to dissuade Archer & White from pursuing the lawsuit, offering almost $1 million by way of settlement, and urging Archer "to make the whole thing go away without a lawsuit," and suggesting that, despite not being a party to the lawsuit, maintaining the lawsuit "*will not work for Benco on a lot of different levels*."

72.      That Benco, a supposed competitor of companies facing a serious antitrust lawsuit, would offer to pay to make that suit go away to protect its supposed competitors is an action against self-interest indicative of cartel behavior. Absent Benco's participation alongside Henry Schein, Patterson, and Burkhart in the overarching agreement not to compete on price, it would make no business sense for Benco to indemnify the anticompetitive conduct of its rivals.

73.     Underscoring the co-conspirators' knowledge of wrongdoing, Burkhart's Jack Bowers told Henry Schein's Mark Lowery and Dynamic Dental's Skip Pettus in 2008 that they "have to be very careful, if a customer doesn't like us, they could have us all up on price fixing. . . . Price fixing or—or somebody complaining about getting together as a group and saying: Okay, well, we're going to hold to a certain margin."

## DEFENDANTS FURTHERED THE OVERARCHING AGREEMENT
## NOT TO COMPETE ON PRICE WITH A "NO-POACHING" AGREEMENT

74.     In support of their overarching agreement not to compete on price, Defendants agreed

not to actively try and undercut each other's prices as a means of gaining business.  For instance,

Defendants agreed that when one or more of the distributors had sales representatives in the

same geographic area, which includes most major cities, those sales representatives would not

actively pursue one another's existing or nearly-consummated business by trying to undercut

each other's prices.

75.     In furtherance of the Cartel Members' overarching agreement not to compete on price,

Defendants agreed not to actively recruit or "poach" one another's sales employees.  Especially

in a market, such as this one, in which price competition is suppressed due to an overarching

agreement not to compete on price, competition for dental sales is relationship driven.

Distributors' sales representatives build strong business and personal relationships with their

dental practice customers, so the loss of a sales representative to a competitor exposes the sales

representative's former employer to potential lost sales to the new employer.  Accordingly, the

Defendants agreed amongst themselves that they would not actively recruit or poach one

another's sales representatives, i.e., they entered into a "no-poaching agreement."

76.     To enforce their "no-poaching" agreement, Defendants monitored and communicated

about one another's sales representative hiring to ensure compliance.

77.     For example, in February and March of 2012, the President of Henry Schein and a

Managing Director of Benco exchanged text messages regarding Benco's hiring of a former

Henry Schein sales representative. On March 2, 2012, the Benco Director sent a message stating,

"You asked me to let you know re [the employee]. We are hiring her, starts next week."  In a

later message, the Benco Director wrote:

> **We agreed** that she would sit even though she didn't have a contract. And she did sit, even longer than the agreement says. We never talked about whether she counts toward **the limit**. You fired her, **we didn't recruit her**.

78. Moreover, the Defendants' sales representative no-poaching agreement has been described in the industry by dental manufacturers as well as by a representative of Benco, as an ongoing "gentlemen's agreement" among the Defendants not to actively recruit one another's sales representatives.

79. This no-poaching agreement bolstered the efficacy of their overarching agreement not to compete on price, reducing competition for customers and mitigating the threat that competitive forces could undermine the anticompetitive goals of the conspiracy.

### THE CARTEL MEMBERS FURTHERED THEIR OVERARCHING AGREEMENT NOT TO COMPETE ON PRICE THROUGH EXCLUSIONARY GROUP BOYCOTTS

80. All else equal, Henry Schein, Patterson, Benco, and Burkhart's cartelized prices and supracompetitive profit margins should have enticed rival distributors to enter and expand by offering lower prices and earning lower, but still profitable, margins. Though new entrants would have to overcome entry barriers, they could reasonably expect to succeed by undercutting the Cartel Members' supracompetitive pricing and profits. Discounting rivals could (and when allowed to sell often did) pay manufacturers more for their products than Cartel Members, while at the same time charging dental practices less for those same products than Cartel Members—while still making a reasonable profit. The enhanced competition should (and would have), in turn, have forced the Cartel Members to lower their cartelized prices to competitive levels (or be forced out of the market). In fact, at least as far back as 2004, these high prices and profit margins did entice rival distributors to **attempt** to expand their market presence. However, their efforts were stymied and reversed by Henry Schein, Patterson, Benco, and Burkhart's

overarching agreement not to compete on price, which included a collective scheme to boycott critical industry participants that dealt with lower-priced rivals, with the intent of excluding and impairing the rival discounters.  The Cartel Members' aim was to get the rivals to raise their margins to cartelized levels or cut them off entirely. These group boycotts were undertaken in furtherance of the Cartel Members' overarching conspiracy, serving as an enforcement mechanism that disciplined (or eradicated) any distributor that did not fall in line with Henry Schein, Patterson, Benco, or Burkhart's cartelized prices.

81.     To successfully enter or expand, a rival distributor must be able to: (a) offer a comprehensive line of dental supplies and/or equipment encompassing a wide range of products; (b) be able to purchase products in sufficient quantities to avail themselves of economies of scales (or position themselves to be able to purchase in such quantities in the not-so-distant future); and (c) efficiently reach a sufficient number of dental practices and manufacturers to achieve (a) and (b).

82.     One important mechanism to reach dental practices and manufacturers efficiently is to participate in and/or joint venture with state dental associations—voluntary associations of dentists—which possess an important ability to connect distributors with customers and suppliers. These associations can foster competition by endorsing or joint venturing with new distributors or distribution platforms and providing them efficient access to market participants. These dental associations, however, can also serve as a "choke point" at which incumbents like Defendants can—and did—leverage their collective market power to block the entry of lower-priced rival distributors, including distributors with innovative sales and distribution techniques that threatened the business models, and profit margins, of the Cartel Members.

83.     Moreover, in order to offer a broad product line, a distributor must have working

relationships with myriad manufacturers. Above distributors in the supply chain, manufacturers are fragmented, with over 300 manufacturers selling dental supplies and equipment. Defendants account for the overwhelming portion of individual manufacturer's sales (while each individual manufacturer constitutes a relatively insignificant portion of Henry Schein's, Patterson's, Benco's, and Burkhart's purchases). Put another way, in this market, distributors are overwhelmingly more important to manufacturers than manufacturers are to distributors, putting distributors into a position of power that they can—and did—collectively use to coerce manufacturers to force lower priced rivals to raise their prices or face being cut off entirely.

84.     Absent the conduct alleged herein, including the group boycott, it would be in the interests of dental supply and equipment manufacturers to expand the number of distributors of their products, and in particular to sell to discounting distributors and, in addition, to sell through more efficient distribution channels and methods. Regional dental supply and equipment distributors typically paid *more* to manufacturers for the products than Cartel Members and sold the products to dentists for *less*.  Thus, from the perspective of the manufacturers, selling to discounting distributors had the potential to make them more money per item and sell more items (due to the lower end user prices). It was only because of the group boycott and the substantial collective market power of the Cartel Members, who were acting jointly, that manufacturers were coerced into pressuring rival distributors to raise prices or be cut off entirely.

85.     In a competitive market, a single distributor's boycott of a dental supplies or equipment manufacturer would contravene that distributor's unilateral self-interest. A customer wishing to purchase products from the boycotted manufacturer could purchase the products through a competing distributor. That competing distributor would, in turn, gain market share and profits at the expense of the distributor unilaterally conducting the manufacturer boycott. Accordingly, a

manufacturer boycott of the type alleged here would only occur, and only makes economic sense, if those entities engaging in the manufacturer boycott were doing so collectively, and by agreement. Indeed, officials at Archer & White confirmed this economic analysis, stating that it always took at least two of the Cartel Members—usually the two who happened to be dominant in any one particular product—before a manufacturer would succumb to the pressure to force Archer & White to raise its margins or face being cut off. Had Cartel Members not been acting as a part of a conspiracy, it would have made no economic sense for any one individual Cartel Member to boycott dental supplies and equipment manufacturers.

86.     The Cartel Members have jointly leveraged their collective power over manufacturers in order to exclude actual and would-be national competitors at least as far back as 2008, and with respect to Defendants, have leveraged their power over state dental association at least as far back as 2013. As set out below, several prominent actual and potential distribution rivals have been successfully targeted by these group boycotts, including Archer & White, its joint venture Dynamic Dental, Amazon.com, Inc., SourceOne, and Pearson Dental Supply.

**A.     Henry Schein, Patterson, Benco, and Burkhart Target Their Group Boycott at Archer & White**

87.     For a time from 2004 until 2008, Archer & White and its joint venture partner, Dynamic Dental, were relatively small (compared to Cartel Members), but nonetheless were nationwide competitors of the Cartel Members, selling to 16,000 customers throughout the country and earning millions of dollars in revenue annually from those sales. Archer & White and Dynamic Dental offered equal or superior service, at markedly lower prices, causing one Henry Schein employee to quip that the Cartel Members looked like "idiots" when they tried to compete against Archer & White using their cartelized prices. Jack Bowers of Burkhart confided to Archer & White's Skip Pettus that Dynamic had hurt Henry Schein and Patterson at the national

level. In fact, dating back to 1997, Archer & White had been told by Mark Mlotek, Henry

Schein's then in-house counsel, that if Archer & White refused to sell the business to Henry

Schein, Henry Schein would put it out of business.

88.     By 2008, the Cartel Members' group boycott had put Dynamic Dental out of business.

Further, the group boycott has substantially impaired the ability of Archer & White to sell

multiple lines of products or to compete effectively against the Cartel Members on a national

level. Archer & White continues to do business, but, as a direct result of the Cartel Members'

group boycott and other conspiratorial conduct alleged herein, it has lost all of its nationwide

distribution rights from multiple major dental equipment manufacturers, and most major

manufacturers refuse even to grant it localized or regional distribution rights. Although Archer &

White continues to sell to some 16,000 dentists nationwide, it sells them only a small fraction of

the products it otherwise would be able to carry and sell because it is no longer a full-line

distributor, limiting its ability to grow and to discipline Henry Schein, Patterson, Benco, and

Burkhart's cartelized pricing.

89.     By way of example, Henry Schein can and does exert a particularly strong influence over

A-dec, Inc. ("A-dec")—a manufacturer of dental chairs—as Henry Schein is one of A-dec's

largest distributors in the United States and its largest distributor in Europe.

90.     In a related vein, Patterson can and does exert a particularly strong influence over A-dec,

Inc. and Midmark Corp. ("Midmark")—another manufacturer of dental chairs—as Patterson

distributes a large share of both manufacturers' dental chairs and related supplies and equipment

sold domestically.

91.     Between 2004 and 2008, Archer & White attempted to obtain the rights to distribute A-

dec's products, intending to sell them at margins below the cartelized levels.  A-dec informed

Archer & White that, as a result of pressure and threats from both Henry Schein and Patterson (as part of their overarching agreement not to compete on price), A-dec had no choice but to refuse to allow Archer & White to distribute A-dec's products. If A-dec supplied Archer & White, Henry Schein and Patterson vowed not to carry or promote A-dec's products—a threat that A-dec was forced to heed even though it otherwise would have been in A-dec's interest to have Archer & White expand the market for its products.

92.     Absent coordinated conduct, this boycott would have made no economic sense. If A-dec was cut off by Henry Schein alone, for example, it could have shifted sales to Patterson, who would in turn have been able to grow by selling to dentists previously supplied by Henry Schein.

93.     Due to jointly applied coercive pressure from Henry Schein and Patterson, dental equipment manufacturer, Midmark, refused to allow Archer & White the right to distribute Midmark's products. These Cartel Members jointly pressured Midmark to cut off Archer & White as part of the overarching conspiracy not to compete on price because Archer & White's and Dynamic Dental's lower pricing posed a competitive threat. If Midmark continued to supply Archer & White or Dynamic Dental, Henry Schein and Patterson vowed to refuse to distribute, sell or promote Midmark's products—a threat that Midmark had no choice but to heed given the collective power of these Cartel Members. The pressure from Henry Schein and others on Midmark dates back to at least 2005, when Mike Hall of Midmark told Phillip Salerno of Archer & White and Dynamic Dental that "you guys are hated so much by Schein that you are too hot a topic to open up as a distributor."

94.     A January 16, 2008 internal email from another manufacturer, Pelton & Crane—a manufacturer of dental chairs and related products—reflects similar pressure applied by Cartel Members on Dynamic Dental for its practice of undercutting the cartelized margins. That email,

from Dan Bump of Pelton & Crane, questioned why Pelton & Crane "was considering ending [its] relationship" with Dynamic Dental, which was at the time Pelton & Crane's "#5 dealer in the U.S." Another Pelton & Crane employee responded, "Burkhardt & H[enry] S[chein] seem to feel differently. They feel they have lost significant orders to Dynamic Dental due to very low pricing and therefore have shown significant support to *other manufacturers* [instead of Pelton & Crane]. I will see the numbers personally next week. My concern and question is did we push away more business than we received? . . . [They] have been denied by ADC for membership, they have (by rumor) been cut off by [dental manufacturers] Belmont and Bio-Lase (confidential) *all due to the same concerns I have*." That same Pelton & Crane employee noted he was "receiving similar complaints not from one [distributor], *but from all in the area*. I am supposed to have in my hand on Tuesday an invoice from a doctor that has been calculated to show a 19% margin for Dynamic Dental. This, as you know is not healthy for anyone. . . . Please keep in mind that we are all transitioning and *cooperation is important on all sides*."

95.     The January 16, 2008 email from Pelton & Crane's Dan Bump above followed a January 15, 2008 conversation between Don Givens and Mark Lowery in which Givens was threatened by Mark Lowery to not bother coming into the Henry Schein office until Pelton & Crane had cut off Dynamic Dental and Archer & White.

96.     After the January 16, 2008 email, Pelton & Crane, yielding to Henry Schein and Burkhart's collective threats, cut off Archer & White and Dynamic Dental.

97.     Days before Dynamic Dental received Pelton & Crane's termination letter, Henry Schein sales representatives bragged to Dynamic Dental sales representatives that the termination was forthcoming and was the result of pressure and intimidation by Henry Schein and Burkhart. Specifically, the representatives mentioned a companywide phone call at Henry Schein in which

the Henry Schein personnel were alerted that in the coming days, Pelton & Crane would notify
Dynamic Dental that it was being terminated. During the phone call, Henry Schein management
claimed that they and Burkhart were responsible for the termination.

98.    The coordination of complaints by the Cartel Members to Pelton & Crane, made jointly
on the same call or coming on the same day within hours of each other, would not have
happened absent agreement and collusion by the Cartel Members to engage in the group boycott.
Archer & White's and Dynamic Dental's prices were non-public, so the only way the Cartel
Members would know the pricing offer from the lower-priced distributor was if the dentist told
one of its sales representatives. But even if one of the Cartel Members learned of the price there
is no way that the other major distributors would know that pricing—especially at the exact same
time—unless they were regularly communicating about pricing and margins as part of the
overarching conspiracy and group boycott.

99.    On February 14, 2008, after having been initially confirmed for membership in the
American Dental Cooperative, Dynamic Dental was informed that "[b]ased upon **input received**,
we are not able to process your application for membership at this time." This correspondence
was dated **almost a month** after the internal Pelton & Crane email in which Pelton & Crane
expressed knowledge of Dynamic Dental's termination and that it was attributable to pressure
from Dynamic Dental's rival distributors.

100.    Another example of the Cartel Members' group boycott involved Cartel Members' joint
threats to a dental equipment manufacturer, called Instrumentarium. Henry Schein and Patterson
were dominant distributors of Instrumentarium's products. As a result of Henry Schein and
Patterson applying pressure to Instrumentarium, Instrumentarium required Archer &
White/Dynamic Dental to seek permission to attempt to make sales of Instrumentarium products

to the customers of any other distributor, **even** when the other distributor was selling or trying to sell **other** manufacturers' competing products to those customers. A December 16, 2008 email recounts requests by Archer & White/Dynamic Dental to sell Instrumentarium products to a doctor whom Patterson was trying to sell a competing product manufactured by Planmeca Dental and a doctor whom Henry Schein was trying to sell a competing product manufactured by Gendex Dental Systems. Ultimately, and against its own economic interest (absent the group boycott), Instrumentarium denied each request. This procedure of ensuring another distributor was not attempting to make a particular sale was not a requirement at the inception of Instrumentarium's relationship with Archer & White/Dynamic Dental, but was introduced by Instrumentarium in the late 2000s as a result of collective pressure from Cartel Members, including, without limitation, Henry Schein and Patterson.

101.    On March 10, 2008, Instrumentarium's Sales Representative, Richard Centala, relayed an email message to Archer from Mike Null, Instrumentarium's Director of Sales: "Having already received calls from Schein/Chicago and Patterson/Indi. about, 'Who [i]s  Archer & White and how can they sell digital pans [approx. price: $45,000] into our territory?,' I would prefer if A&W would not quote on this CrxD Pan."

102.    On December 11, 2008, Instrumentarium's Null informed the lower-priced distributor that its quotations to multiple dentists in Pennsylvania were undercutting prices offered by Defendants "and [were] creating problems for us." The prices offered, Null stated, "were considerably lower than the other dealers and considerably below the market price for these systems. . . . **These two situations have caused us a considerable problem for both of the dealer** [distributor] **stores in these areas and with their management.  We must therefore ask that you inform these doctors that** [you] **will be unable to sell these systems to them.**"

31

103.    In another contemporaneous email, Mike Null's email stated: "I received a call today *from both Patterson Dental and Schein in Sacramento.* My local rep has also been in Dr. Wee's office, on behalf of Schein, for a sales presentation on VT. Both have been to Dr. Wee's office and both have quoted him on an OP200 with VT. Burkhart is also in the hunt.  *I'll have to ask you to back off on this one.* Dr. Wee is shopping price with all of the local dealers in the Sacramento area. Thanks for your cooperation."

104.    In December 16, 2008 email chain between Intrumentarium's Mike Null and Archer & White/Dynamic Dental, with the subject line "Re: URGENT!!!," Archer & White/Dynamic Dental requested permission to sell to "Sunny Ridge Ortho." Mike Null responded, "Give me a day on this. This could be a problem. This is in [Henry] Schein's backyard and [Henry] Schein is raising hell about your current pricing and flat screen [TV] giveaway." Mr. Null eventually did not authorize the sale, writing, "Jim, hold on the Sunny Ridge order for now. You can't believe what an issue you've become at [Henry] Schein corporate." The hold was indefinite.

105.    A March 30, 2009 email thread between Archer & White/Dynamic Dental to Instrumentarium reflects that "the rules that we set" were that Archer & White/Dynamic Dental's would "assure[] [Instrumentarium] that [the targeted customers] had not talked to any" other distributors. An earlier email in the chain from Instrumentarium shows that "[s]o long as the doctor is not asking a[nother] dealer [distributor] to quote" the product then it "is ok with us."

106.    Eventually, even this "pre-approval" regime between Archer & White/Dynamic Dental and Instrumentarium proved to be too much of a competitive threat to the Cartel Members, and Instrumentarium revoked Archer & White/Dynamic Dental's national sales rights and restricted them to the State of Texas. Mike Null wrote to Archer & White on March 31, 2009:

> Our reps live off the business they receive and the relationships and trust they develop with their local [distributors], *regardless of which [distributor] they may be*. Getting an

occasional 'blue bird' from you just isn't worth them losing the ongoing, repeat business of their local [distributors] and these situations *always* draw the attention and ire of the corporate management *regardless of which [distributor] it may be*. I received two calls of this nature today. . . . [Your low pricing] places them at a disadvantage . . . . Unfortunately, this simply isn't working . . . . [We] are building ill-will with our other [distributors] and many of their sales people over units you are selling into their areas of representation. And our sales reps are angry and upset *over the damage it is doing them in their sales territories*. It's time to put an end to a situation that is not working for you, us, our dealers and your customers.

107.    The likely and indeed most probable explanation for how Instrumentarium's sales representatives were being damaged by Archer & White/Dynamic Dental selling Instrumentarium's own products, and thus generating commissions for those sales representatives, is that they were being retaliated against or feared retaliation from Cartel Members, "regardless of which [distributor] they may be."

108.    Moreover, in a letter Archer & White/Dynamic Dental received from Instrumentarium on April 2, 2009, "the integrity of [Archer & White's] end-user pricing" was specifically cited as a reason for their restriction to the State of Texas. But Instrumentarium, who receives the same list price from Archer & White/Dynamic Dental no matter what markup was charged on top of that list price, should have had no concern with, or interest in, their lower markups. Indeed, if anything, Instrumentarium would have wanted its distributors to charge lower markups, so as to make its products more price competitive and allow it to expand its market share vis-à-vis rival manufacturers of analogous dental supplies and equipment.

109.    The April 2, 2009 letter allowed Archer & White/Dental Dynamic to consummate one, final national Instrumentarium sale (despite having been denied such authority for numerous other sales throughout the nation, including, *inter alia*, in Pennsylvania, Illinois, Wisconsin, Oregon, Missouri, and California). Glaringly, that final national sale, unlike those for which authorization was denied, was to a dentist for whose business neither Henry Schein, Patterson,

Benco, nor Burkhart had already submitted a bid.

110.    As above, the coordination of complaints by the Cartel Members to Instrumentarium would not have happened absent agreement and collusion by the Cartel Members to engage in the group boycott. Archer & White's and Dynamic Dental's prices were non-public, so the only way the Cartel Members would know the pricing offer from the lower-priced distributor was if the dentist told one of its sales representatives. But even if one of the Cartel Members learned of the price there is no way that the other major distributors would know that pricing—especially at the exact same time—unless they were regularly communicating about pricing and margins as part of the overarching conspiracy and group boycott.

111.    In fact, Instrumentarium should have been pleased with Archer & White/Dynamic Dental's lower prices because those lower prices would create increased demand, sales, and profits for Instrumentarium.  Moreover, Archer & White/Dynamic Dental likely paid Instrumentarium more per unit than did the Defendants, meaning that Instrumentarium should have been doubly pleased that Archer & White/Dynamic Dental was making the sales: more units sold with more money per unit going to Instrumentarium.

112.    In approximately 2009, in furtherance of the Cartel Members' overarching agreement not to price compete, and in particular, their group boycott, Scican Dental—a manufacturer of dental instruments—terminated its relationship with Archer & White, citing a threat from Henry Schein and Patterson that Scican Dental would be cut off from those distributors' critical distribution channels if Scican kept doing business with Archer & White. Scican represented to Archer & White that the threat had come from Henry Schein's and Patterson's sales representatives.

113.    In September of 2010, a sales representative from another manufacturer, Coltene-Whaledent, left Archer & White a voicemail message. The message relayed that the

manufacturer "need[ed] to talk to" Archer & White because they were "getting quite a bit of heat from [Henry] Schein [and] I don't know who else, considering your pricing, I'm going to have to ask you to please get [your] price up, we're going to ask you to take it to at least 28% . . . *they* bitch about it from time to time and it[']s come to a head." The sales representative noted that he had gotten a call earlier that morning "ranting and raving" about Archer & White's low prices.

114.    Following the phone call, on September 21, 2010, Archer & White received an email from John Eaton, a Midwest Regional Manager for Coltene-Whaledent. The email stated:

> James, Good morning. Hope all is well in the big D. I am getting some heat from *several dealers around the country* concerning your pricing of the UC300 and UC95 [product lines]. You basically have it priced at or below wholesale cost. I need you to work with me to *get the pricing more in line with the competition*. I'd like to see it priced at a 28-30% margin. I'm sure this is just an oversight and I appreciate you working with me to correct the pricing. I appreciate the support.

115.    When Archer & White refused to raise their prices in response to the pressure from Henry Schein and other Cartel Members, Coltene-Whaldent *raised* Archer & White's acquisition cost for these products, which caused Archer & White, in turn, to raise its net price to the customer in order to make a profit.

116.    In approximately 2012, Bien-Aire Medical Technologies ("Bien Aire")—a manufacturer of dental micromotors and other products—terminated its relationship with Archer & White citing a threat from Henry Schein and Patterson that Bien Aire would be cut off from those distributors' critical distribution channels. Bien Aire represented to Archer & White that the threat had come from Henry Schein's and Patterson's management personnel.

117.    Also in approximately 2013, as part of the Cartel Members' group boycott, Airbex—a manufacturer of X-ray machines—terminated Archer & White's nationwide selling rights. The termination came just after Airbex was purchased by Danaher, a manufacturer over which Patterson and Henry Schein exercised great influence, and after Danaher reported to Archer &

White that the two had complained to Danaher executives about Archer & White's low-pricing. As with their previous invitation for Archer & White to join their cartel, Henry Schein and Patterson urged Archer & White, through Danaher sales representatives, to raise their prices or be cut off. In January of 2014, Archer & White was cut off for refusing to raise its prices.

118.    In fact, the Cartel Members' targeting of Archer & White has its roots in conduct beginning as far back as 2001 when KaVo Dental—a manufacturer of dental equipment including hand pieces and turbines—told Archer & White that it was being threatened with boycotts by Benco and Patterson as a result of Archer & White's discounted prices. KaVo Dental terminated Archer & White as a distributor that year in response to the collusive threats from Benco and Patterson

119.    Archer & White was also denied permission to open a branch in Kansas City, Missouri, through which it had planned to sell Dental EZ equipment. Mike Morgan at Dental EZ relayed to Archer that boycott threats from Henry Schein and Patterson caused the denial. Archer & White was also denied the right to distribute Dental EZ products in Texas, in which Dental EZ cited boycott threats from Henry Schein, Patterson, and Benco.

120.    Other major manufacturers including, *inter alia*, Belmont Equipment stopped doing business with Archer & White and Dynamic Dental during this boycotting campaign. In 2008, several manufacturers cut off Archer & White within months of one another due to the group boycott. Archer & White and Dynamic Dental were either given no justification for these terminations, or their low prices, sometimes referred to as lack of "margin integrity," were given as a justification.

121.    In furtherance of the Cartel Members' overarching agreement not to price compete, and in particular the group boycott, representatives from manufacturer Royal Dental reported similar

pressure to terminate Dynamic Dental. Henry Schein told Royal that Henry Schein would prioritize Royal's products if Royal would stop selling to Dynamic Dental. Henry Schein's equipment manager, Mr. Hernandez (who now works for Benco), initially told Royal that Royal would need to offer its products on consignment for placement in Schein's showroom. Hernandez then offered an explicit *quid pro quo*, saying "I'll make it easy for you:" if Royal stopped selling to Dynamic Dental, Henry Schein would purchase the Royal products outright instead of requiring consignment. Thereafter, Royal terminated Dynamic Dental.

122.    As with the Pelton & Crane and Instrumentarium boycotts, the coordination of these complaints and threats to all of these manufacturers by the Cartel Members, sometimes made jointly on the same call, and most often coming on the same day within hours of each other, would not have happened absent agreement and collusion by the Cartel Members.

123.    Following Pelton & Crane's termination of Dynamic Dental and Archer & White, former Dynamic Dental and Archer & White sales representatives Phillip Salerno and Skip Pettus were hired by Benco. While associated with Archer & White, and following their termination, Pelton & Crane would not even return Mr. Salerno's and Mr. Pettus's phone calls. Following their hiring by Benco, Pelton & Crane promptly met with Mr. Salerno and Mr. Pettus in approximately June of 2009. Pelton & Crane's representative, a Mr. Skinner, explained that the refusal to deal with Archer & White was just the actions of "natural man," and that "to be honest," he felt "it's rooted in politics and rooted in other dealers in the state." When Mr. Salerno and Mr. Pettus inquired whether they could be cut off by Pelton & Crane again, Mr. Skinner assured them it would never happen to a ***Benco*** sales representative: "You're a major player now with Benco here. It's a level playing field [with Benco]. ***Benco's right up there with Schein***."

**B.      Henry Schein, Patterson, and Benco Boycott Dental Associations and Other Entities Working With SourceOne**

124.    In October 2013, a new distributor with a wide-ranging product offering comprised of over 50,000 distinct dental supplies and equipment—SourceOne—created a dental supplies distribution platform in partnership with the Texas Dental Association ("TDA"). SourceOne's existing e-commerce platform, which operated nationwide, was already a lower-priced distribution option vis-à-vis those of Henry Schein, Patterson, and Benco. But its new sales platform, "TDA Perks Supplies," offered dental practices the opportunity to avail themselves of even lower distribution prices: on average 30 percent below those of Defendants. The platform was an immediate success and quickly positioned itself for nationwide expansion.  Rivals besides SourceOne, drawn to the platform's initial success, began planning efforts with other state dental associations to implement similar programs.

125.    With the advent of an efficient national competitor that threatened their cartelized prices and sizeable profit margins, Henry Schein, Patterson, and Benco's reaction was swift, fierce, and coordinated. This aspect of the group boycott began in mid-to-late-2013, continues to the present, and involves three interrelated actions.

126.    *First*, as with the Archer & White and Dynamic Dental boycott, Henry Schein, Patterson, and Benco threatened manufacturers in concert: should you continue to, or choose in the future to, sell your products through SourceOne, we will refuse to sell or refuse to actively promote your products through our distribution channels. As before, because of these distributors' substantial collective market share, accounting for nearly 90% of the distribution market, the loss of these distributors as a sales channel would have been devastating to these manufacturers. Accordingly, many manufacturers have been and are beholden to Defendants, and thus the Defendants' collective threats were and continue to be successful in coercing manufacturers to abandon or forgo business relationships with SourceOne.

38

127.    That manufacturers were yielding to credible collective threats from Defendants is further evidenced by *which* manufacturers ceased doing business with SourceOne and *which* did not. Some (though a minority of) manufacturers with which SourceOne deals do not sell substantial volumes through Henry Schein, Patterson or Benco. These manufacturers did not succumb to the group boycott and remained affiliated with SourceOne.

128.    Comparatively, those manufacturers that did substantial business with Henry Schein, Patterson, or Benco caved to the collective threats. Many of these same manufacturers that cut off SourceOne as a result of the group boycott represented substantial portions of SourceOne's business. In fact, SourceOne abruptly lost access to dozens of product lines, including many of SourceOne's most important and highest-selling items. By April 2014, SourceOne had lost access to at least 75% of its top selling products, crippling its ability to compete with Defendants. One of SourceOne's product sources, an intermediary distributor called DDS Dental Supplies, told SourceOne that it would no longer supply SourceOne because of pressure applied on manufacturers by Henry Schein, Patterson, and Benco. Similarly, DMG America, a manufacturer of dental restoration products, told DDS Dental Supplies that it would no longer allow its products to be supplied to SourceOne because of such threats. Other manufacturers that abruptly stopped allowing their products to be supplied to or sold through SourceOne include Sultan Healthcare, Danaher, Heraeus Kulzer, Ivoclar Vivadent, Quala, and Septodont. *None* of these manufacturers or intermediary distributors had ever voiced any concerns with SourceOne until **after** the 2013 announcement of SourceOne's innovative new distribution platform, and the beginning of the group boycott. Their decisions to stop selling to SourceOne was contrary to their own economic interests (in the absence of the group boycott), as they forfeited the significant future revenues that would have earned by continuing to sell to SourceOne.

129.    When SourceOne sought replacement suppliers, candidates including DHP Dental were deterred from doing business with SourceOne as a result of Henry Schein, Patterson, and Benco's collective boycotting efforts.

130.    *Second*, Henry Schein, Patterson, and Benco, acting in concert, boycotted the annual meetings and trade shows of state dental associations that were partnering or doing business with SourceOne, and threatened to boycott those that were considering the same. They also collectively pressured manufacturers and other distributors to join the boycott.

131.    Traditionally, Henry Schein, Patterson, and Benco have sent sales representatives to attend and participate in the annual meetings and trade shows of state dental associations, and state dental associations depend on the revenues generated by the participation of major distributors like Henry Schein, Patterson, and Benco at these events. In March of 2014, a Patterson representative met privately with the TDA representatives and demanded that the TDA end its relationship with SourceOne, or Patterson would withdraw from the TDA's annual trade show and refuse to advertise in the TDA's publications. In April of 2014, a Henry Schein representative privately delivered an identical message. These threatened boycotts were coordinated, and they deterred other state dental associations that had expressed interest in partnering with SourceOne from doing so, including, *inter alia*, the Colorado Dental Association, the California Dental Association, and the Virginia Dental Association. In the absence of the group boycott, SourceOne's new program would have spread through the nation rapidly, as evidenced by an April 9, 2014 email, in which a representative of the TDA wrote the "next link" in SourceOne's "unfolding saga" would be that the "the American Dental Association and most large states would [be] onboard *in a nano-second*, and that is the reason for the suppliers' fear." And in a February 3, 2014 email from Henry Schein to the TDA, Henry Schein's Dean Kyle

threatened the TDA: "I am concerned the Board does not understand the *far reaching impact*" of its decision to endorse and partner with SourceOne.

132.    When state associations refused Henry Schein, Patterson, and Benco's collective demands, Defendants in fact carried through on their threats to boycott annual trade shows. Defendants refused to attend trade shows organized by the TDA in 2014 and the Arizona Dental Association ("AZDA") in 2015—in turn forfeiting substantial deposits advanced to the associations—while a threatened boycott of the Louisiana Dental Association ("LDA")'s 2015 annual show was avoided only when the LDA abandoned its plans to associate with SourceOne.

133.    Although Defendants were the only *distributors* not to attend the TDA and AZDA events, dozens of dental supplies and equipment *manufacturers* also refused to attend TDA's 2014 trade show pursuant to Defendants' collective coercive demands; these manufacturers communicated to TDA and AZDA that their decision to pull out of their events was a result of pressure applied by Henry Schein and Patterson. The TDA and AZDA suffered financial hardship and its event was less profitable as a result of Defendants' boycott. Since the boycott, AZDA has not actively promoted SourceOne to its membership.

134.    These group boycotts had a cascading effect on other state dental associations.

135.    The LDA, fearful of Defendants' retaliation, specifically attempted to disguise its relationship with SourceOne, planning to announce the business relationship only *after* their annual trade show. Unfortunately, Defendants learned of the planned relationship in advance of the event despite the LDA's efforts and again threatened a group boycott. In light of Defendants' recent boycotts of TDA's and AZDA's events, LDA yielded to the threats and abandoned its endorsement of SourceOne.

136.    The Colorado Dental Association reported to SourceOne in January 2015 that it was

"concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support to the CDA [Colorado Dental Association] and our largest component society which hosts the Rocky Mountain Dental Conference each year" if it associated with SourceOne.

137.    Internal notes from the Virginia Dental Association ("VDA") reflect that Defendants' boycotts influenced the VDA not to pursue a relationship with SourceOne. The notes indicate VDA's awareness that the TDA has "had some push back from the major suppliers . . . but generally, members seem to be realizing significant savings and are happy with the [SourceOne] program." Later, the VDA observes that the push back has intensified: "TX has had some major pushback from the suppliers because of [SourceOne's] program. They had 15 companies pull out of the exhibiting [sic] at the TDA Annual meeting in response to the [SourceOne] endorsement and have had some real issues with their relationship with the suppliers. It was also noted that some [dental] offices have had issues when they need service from one of the main suppliers [Defendants] for something in the office. ***When they are not ordering from the [incumbent] suppliers, their priority on the repair list seems to slip***." Ultimately, a November 6, 2014 email reflects that the VDA, after "really think[ing] about the consequences of [endorsing SourceOne]," including the fact that "major suppliers and equipment dealers will (are) very upset about this and won't take it laying down. I suspect they will punish [state dental associations] in some way," the VDA forwent the opportunity to affiliate with SourceOne.

138.    In contrast, the Nevada Dental Association, which has no annual trade show for Defendants to boycott and so was less susceptible to Defendants' threats, did follow through with a planned partnership with SourceOne.

139.    *Third*, Benco, Henry Schein, and Patterson, acting in concert, agreed to boycott dentists that purchased supplies from SourceOne by withholding service and repair for installed

42

equipment at those dental practices, or to provide service and repair at higher prices or with

significant delays. Dentists depend on this equipment to treat their patients and the threatened

loss of service not only jeopardizes the dental practice's business, but the quality and efficacy of

the treatments their patients receive.

140.    Henry Schein, Patterson, and Benco have also misrepresented to dentists the nature and

quality of dental supplies and equipment sold through SourceOne, misrepresenting them as

expired, counterfeit, altered, unauthorized, or otherwise unfit for their purpose.

141.    All three prongs detailed above were effectuated by Defendants in unison, pursuant to an

agreed anticompetitive response to SourceOne. Defendants facilitated their conspiratorial

conduct through in person meetings at trade shows, though business and personal email, and

through business and personal cell phone calls and text messages. Each Defendant's employees,

many having previously worked for another Defendant, had close relationships through social

and business gatherings and shared a common motive and opportunity to exclude SourceOne and

similar competitors from the market. They acted on that motive.

142.    Defendants communicated with each other about the TDA, and reached an agreement to

boycott the TDA as a group.  On November 1, 2013, a Henry Schein employee wrote to a

colleague at Henry Schein, "***Let's talk with P[atterson], Benco, . . . . [and] [n]ot give TDA a

dime***." Another Henry Schein representative responded, "I refuse to work with any manufacturer

rep that sells through [SourceOne]. That's [what] every distributor should say.  The

manufacturers will get scared and pull out."

143.    On or about October 15, 2013, the Henry Schein South Texas Regional Manager had a

phone conversation with a Benco Regional Manager regarding TDA's partnership with

SourceOne.  The Henry Schein Regional Manager recounted in an email that during the call, the

Henry Schein and Benco employees both discussed their mutual interests in jointly boycotting the TDA and then agreed with each other that they would reach out to Patterson to ensure that all three would engage in a group boycott of TDA. The email specifically stated, *inter alia*:

- "Benco considering suspending all activities with the TDA including pulling out of the state show;"

- "[A Managing Director of Benco] will be reaching out to, or has reached out to, [the President of Henry Schein Dental] to see if HSD [Henry Schein Dental] would do the same thing;"

- "[The Benco Regional Manager] wanted to know if I have a relationship with local PDCO [Patterson] RM [Regional Manager] to see if they would consider pulling out as well;" and

- The Benco Regional Manager and the Henry Schein South Texas Regional Manager planned to meet for lunch "to discuss concerns and share what we have found about the program."

144.    In a February 1, 2014 internal email from DDS Dental, a dental distributor, DDS's Dr. Seznik, relays that "Patterson was encouraging Schein to support them in pulling out of meetings" for state dental associations that supported SourceOne.

145.    A March 31, 2014 email thread forwarded by David McCarley of McCarley Dental reflects that at the South Dental Convention:

some of the vendors say that they were told by both Patterson and Schein not to have anything to do with TDA Perks or they would shelve their products nationwide. . . . when I spoke with a Schein rep at their normal sized [booth], he said that they were still having higher-up corporate discussions on whether they would attend the TDA or not, and that Benco was discussing the same. . . . [T]hey really do think that they can derail the [SourceOne] Perks program.

That same email thread reflects that "Big Dental Suppliers are sending false info to Dentists [about SourceOne]. Patterson reps have even called the TDA pretending to be Dentists complaining. We have traced the calls back to the Reps. . . . If this is true I am sure the Board will cut ties immediately with SourceOne."

44

146.     An April 21, 2014 SourceOne email, subject line "Group Boycott of our company organized by largest dental suppliers," reflects that "TDA has received a significant number of cancelations for their annual session (April 30 – May 3) from a variety of manufacturers previously confirmed to exhibit. Many of them cited pressure from both Henry Schein and Patterson as the reason for the last minute cancelation. Many of them informed the TDA that they were specifically threatened by both companies that if they did not cancel their attendance at the conference, various unpleasant things would happen to them."

147.     Boasting about the efficacy of their group boycott, Benco tweeted the day before the TDA's meeting was scheduled to start: "texas meeting will not be the same without key venders there. *#skiptheTDA*" on April 29, 2014. The tweet appears to have since been deleted.

148.     A July 22, 2014 email from Mike Wade of Benco to Daniel Reinhardt of Patterson reflects that "*[w]e are of the same mindset*. It would be gratifying to see every distributor with a local presence make a unified statement on the AZDA's ill-conceived idea" to endorse SourceOne. Reinhardt confirms in that communication that "we will be pulling our sponsorship and attendance of the state meeting" and Wade confirms that they are "looking at pulling our sponsorship." Wade also confirms that he "know[s] that Patterson, Schein and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same thing and *wanted to see if we could create the same message here in AZ*."

149.     On July 30, 2014, Wade of Benco wrote about the AZDA boycott to Brian Goslee of Dentsply, a dental manufacturer, writing: "*I have communicated with our competition at Schein and Patterson* and *we are all of the same mind* that we will not be supporting a competitor's [AZDA's] meeting next year."

150.     And on August 1, 2014, a Benco email discussing the boycott of the AZDA's 2015 trade

show notes that Benco is "extremely disappointed that the AZDA has decided to directly compete with Benco *and our fellow distributors*," and that Benco is "*not alone* in evaluating [its] participation in AZDA events. ***Both Patterson and Schein <u>leadership</u>*** have expressed that they will also review participation if the AZDA continues to" affiliate with SourceOne.

151.    Indeed, six months *before* Henry Schein, Patterson, and Benco's group boycott of the TDA's annual conference—and also months before the TDA *itself* learned that the three distributors (as well as those manufacturers over which Defendants exercise great influence) would not be attending—a sales representative from Tuttnauer—a manufacturer of dental vacuums and other products—visited Archer & White. This sales representative informed Archer & White that Henry Schein, Patterson, and Benco had agreed to boycott the TDA's event, informed Archer & White that Tuttnauer and other manufacturers intended to join the boycott as a result of pressure from the three distributors, and encouraged Archer & White to boycott the event as well. The Tuttnauer representative specifically mentioned that the planned boycott was in reaction to the TDA's affiliation with SourceOne. Archer & White declined to participate in the boycott and attended the TDA's event.

152.    There is no justification for these group boycotting activities absent an anticompetitive aim. In particular, Defendants forfeited substantial deposits at state dental association conferences abruptly and in unison. There is no procompetitive purpose for such collective boycotting activity. **As Benco's Managing Director Rick Cohen publicly stated with regard to the importance of such trade shows: "not attending trade shows is not an option for us."** The reason it was not an option is that failing to go risked losing customers to rival distributors if those rival distributors also attended. This is why it was necessary for the Defendants to engage in a boycott as a group. If they collectively agreed not to attend, none would lose business to the

other and the business risk of not attending diminished dramatically. Thus, in response to state

dental association's endorsement of and partnership with SourceOne, that is precisely what

Defendants did—exercising a self-described non-viable option in unison.

153.    Further, absent collective action on behalf of all of the Defendants, boycotting state

dental association meetings contravenes the unilateral economic self-interest of each Defendant.

For example, a former Patterson and Benco sales representative regularly attended the California

Dental Association's conference because he earned roughly 25% of his annual revenue at the

conference. A Defendant acting alone would not risk causing such harm at the expense of losing

market share and profits to non-participants in the conspiracy. These non-participants could still

participate in boycotted trade shows, service boycotted customers, and purchase from boycotted

manufacturers. A Defendant's boycotting activities makes no economic sense unless it had

assurances from the other Defendants that they were doing so collectively.

**C.    Other Boycotted Competitors**

154.    At various times, as part of the overarching agreement not to compete on price, and in

particular as part of the group boycott, Henry Schein, Patterson, and Benco have worked together

to exclude or impair other nationwide dental supply and distribution competitors, perhaps most

importantly, Amazon.com, Inc., thwarting their efforts to establish or sustain themselves on a

nationwide basis. Perhaps the nation's largest and most successful on-line retailer, Amazon.com

is ideally positioned to purchase and supply dental supplies at low cost, and had begun to make

inroads in the market.

155.    In a February 14, 2014 email, Henry Schein described the competitive threat posed by

Amazon.com: "Amazon is a freight train that will drive down margins and within 18-24 months,

at the most, Team Schein will have to adapt or huge layoffs will occur."

156.    In response to this threat, Henry Schein, Patterson, and Benco agreed, as they did in response to competitive threats from Archer & White and SourceOne and others as part of their overarching agreement not to compete on price, to engage in a group boycott of manufacturers that supplied Amazon.com, and carried through on those boycotts.  For example, in 2015, soon after a large dental supply and equipment distributor conference held in Chicago that Defendants' representatives attended, Defendants informed many of the large dental supplies manufacturers in attendance, including 3M—a major dental supply manufacturer—that if they sold to Amazon, all of the Defendants would cut them off.  Many major manufacturers acquiesced to the threats and refused to sell to Amazon.

157.    Further as part of the group boycott, Defendants threatened to cut off several online medical supply and equipment sales sites unless they agreed not to resell to dental offices.  For instance, Henry Schein and Patterson sell some products that are used by medical offices and dental offices. As a result of the dental cartel, these cross-over products can be obtained through online discounters for medical offices, but as part of the group boycott alleged herein, these online discounters are specifically forbidden to sell the exact same products to dental practices. The websites require purchasers to certify that they are not dental offices in order to be allowed to buy them. There is no rational or efficiency justification for these sales restrictions. The only explanation is that the Cartel Members' substantial collective market power, when acting in concert through the overarching agreement not to compete, can enforce anticompetitive restrictions on sales that analogous distributors who sell medical supplies to physician offices and hospitals cannot.

158.    Pearson Dental Supply, based in Los Angeles, California, is another discount distributor that was cut off from dental equipment manufacturers at the behest of the Cartel Members for

selling below their cartelized pricing and margins. Pearson Dental had a physical presence in eight Western states and distributed products nationwide through its online catalog, until its efforts were stymied by the Cartel Members.

159.     Defendants' conduct has impaired rivals, such as Archer & White, Amazon.com, SourceOne, and others around the country that offered superior distribution platforms on a nationwide scale at notably lower prices. Absent the group boycott, these entities would have disciplined Defendants' pricing power and caused prices to Class members for dental supplies and equipment to drop precipitously as more and more manufacturers, dental associations, and customers bought from and affiliated with Defendants' lower-cost rivals.

## HARM TO COMPETITION DUE TO THE CONSPIRACY

160.     As a result of the Cartel Members' overarching agreement not to compete on price, including, as part of that overarching agreement, agreements to fix and stabilize margins and prices, agreements not to compete for customers, and agreements to boycott persons and entities that did business with dental supply distributors that discounted prices and margins, actual and potential dental distributors were impaired, foreclosed, and excluded and/or discouraged from partnering with manufacturers and/or state dental associations to compete with Defendants. Moreover, and as a result, this conduct maintained and increased the Cartel Members' collective market power, enabling them to charge prices for dental supplies and equipment substantially above competitive levels, to the detriment of Plaintiffs and other members of the Class. This harm to the Plaintiffs and other Class members, in the form of paying artificially inflated prices for dental supplies and equipment, constitutes cognizable antitrust injury and harm to competition under the antitrust laws. To the extent relevant, the anticompetitive actions alleged in this Complaint had other competitive harms as well, including harm to consumer welfare,

reduced choice, and diminished innovation in the market for dental supply distribution services.

161.    To the extent relevant, there are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of the Cartel Members' conspiracy standing alone, and even if there were, there are less restrictive means of achieving those purported procompetitive effects. To the extent that Defendants' anticompetitive conduct or any aspect of their conspiracy has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

### ANTITRUST INJURY TO PLAINTIFFS AND MEMBERS OF THE CLASS

162.    During and throughout the Class Period, Plaintiffs and members of the Class purchased dental supplies and/or equipment from Defendants. As a result of the Cartel Members' overarching agreement not to compete on price, including all of the conduct described herein, members of the Class paid the Cartel Members prices for dental supplies and equipment that were inflated above competitive levels during and throughout the Class Period.

163.    For instance, if new low-cost distributors had not been unlawfully prevented from partnering with state dental associations and dental supplies manufacturers, they would have emerged as substantial nationwide competitors to the Cartel Members, resulting in greater competition and substantially lower prices for dental supplies and equipment, and Plaintiffs and the members of the Class would have paid substantially less for dental supplies and equipment during and throughout the Class Period.

164.    If the Cartel Members had not unlawfully conspired to prevent new low-cost distributors from partnering with state dental associations and dental supplies manufacturers, other competitors would have partnered with state dental associations and manufacturers and emerged as viable nationwide competitors to Defendants, resulting in increased competition and

substantially lower prices for dental supplies and equipment, and Plaintiffs and the members of the Class would have paid substantially less for dental supplies and equipment as a result during and throughout the Class Period.

165.    Because of the overarching agreement not to compete on price as alleged herein, Plaintiffs and members of the Class have sustained, and continue to sustain, substantial losses in the form of paying artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

166.    Injury to Plaintiffs and members of the Class was a direct and foreseeable result of the Cartel Members' overarching agreement not to compete on price. Although the mechanism of antitrust injury to Plaintiffs and to competitors is the same, the damages caused to Plaintiffs and other members of the Class in the form of artificially inflated higher prices for dental supplies and equipment is distinct from, and not duplicative of, the damages caused to competitors in the form of lost profits and business opportunities.

167.    The Cartel Members' anticompetitive conduct is continuing, and so are the overcharges suffered by Plaintiffs and the Class caused by this conduct.

**PRIOR PRIVATE AND GOVERNMENT ACTION AGAINST DEFENDANTS**

168.    Henry Schein, Patterson, and Benco's preference for avoiding price competition through collusion has been the subject of public and private antitrust enforcement actions and government investigations.

169.    The first related lawsuit was lodged by Archer & White in August of 2012 against Henry Schein, certain unnamed co-conspirators (alleged to be horizontal distributor competitors of Henry Schein), and several dental manufacturers. The antitrust claims in that suit, which has been stayed pending adjudication of a motion to compel arbitration, were that:

a.  Archer & White was a lower-cost, higher quality distributor;

b.  Henry Schein, with the aim of impairing this competitive threat and excluding it from the market, acted in concert with others to (i) have Archer & White's membership in a crucial trade organization, the American Dental Cooperative, revoked and (ii) threaten to boycott key manufacturers unless they refuse to sell their products through Archer & White;

c.  Henry Schein acted in concert with its horizontal competitors to allocate customers to one another and engage in bid-rigging;

d.  Henry Schein acted in concert with its horizontal competitors to fix prices and charge artificially inflated prices; and

e.  Henry Schein and others told Archer & White that they would agree to end their boycotting activity if Archer & White would agree to join their cartel and raise their dental supplies and equipment distribution prices, an offer that Archer and White refused.

170.  Defendants' conduct has also spawned government investigations.

171.  In 2014, the Texas Attorney General initiated an investigation of Defendants for violation of Texas's antitrust statutes, issuing Civil Investigative Demands to Defendants. This investigation resulted in an April 9, 2015 complaint against Benco and entry of a consent judgment against Benco on the same day.

172.  The Texas Attorney General's complaint alleges, *inter alia*, that:

The traditional dental supply distributors enjoy close relationships with one another, both personal and professionally. Many sales representatives, and even higher level employees, have previous employment relationships with other distributors. The employees interact regularly in person, at various social gatherings, and industry trade meetings, and remotely, through company email, personal email, personal cell phone calls, company cell phone calls, and text messaging. These close contacts

provide the opportunity for the sharing of competitively-sensitive information among the various distributors and manufacturers.

. . .

Benco and its competitor distributors understood that [a lower-cost rival], with its potentially disruptive new business model, directly competed with them, and perceived a competitive threat based on the lower prices offered by [the lower-cost rival] for many of the same goods offered by Benco and its competitor distributors.

Building on the historic culture of cooperation and communication, Benco and its competitor distributors engaged in ongoing communication over several months about [the lower-cost rival]. They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response.

The collective response to this competitive threat by [the lower-cost rival] was two-fold. Benco and its competitor distributors (1) agreed to break with their traditional pattern of attendance and boycott the annual TDA meeting in May 2014 because they perceived that TDA had positioned itself as a competitor to the traditional distributors; and (2) agreed to pressure other distributors and manufacturers to discontinue supplying [the lower cost rival] and/or end any relationships with manufacturers or distributors that ultimately supplied [the lower-cost rival] in order to stifle the competition provided by the new [] offering.

. . .

Pursuant to this agreement, Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied [the lower-cost rival].

As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing [the lower-cost rival] to lose access to products.

173.    The consent judgment requires Benco to reimburse the Texas Attorney General for the

cost of its investigation ($300,000.00) refrain from engaging in further unlawful conduct, and

cooperate with the Texas Attorney General's ongoing investigation of the remaining Defendants.

174.    Also in 2014, the Arizona Attorney General initiated an investigation of Benco and other

unnamed dental supplies and equipment distributors for violation of Arizona's antitrust statutes.

Benco produced documents and materials to the Arizona Attorney General pursuant to Civil

Investigative Demands issued in October 2014. The investigation remains pending.

175.    The Federal Trade Commission also has an open and ongoing investigation into Defendants' conduct. The investigation remains pending.

176.    In September 2015, SourceOne filed its own suit in this District alleging violations of federal and state competition laws arising from the conduct alleged herein. SourceOne contends that as a result of the Defendants' conduct, "thousands of dentists, and scores of state dental associations, dental supplies and equipment manufacturers, and dental supplies and equipment distributors stopped dealing with SourceOne, or were deterred from dealing with SourceOne." Importantly, none of these government investigations or private enforcement efforts has deterred Defendants from continuing in the anticompetitive campaign alleged herein or provided any compensation to the dentists that Defendants have overcharged. In particular, the Louisiana Dental Association inquired of SourceOne by email on April 14, 2015 whether government regulators had "filed [suit] against Patterson and Schein? . . . That's not to say that it isn't significant that the State successfully clipped Benco's wings. But, if there isn't a similar threat to Schein and Patterson, there's still quite a problem I'd think."

## OTHER FACTORS INDICATING AN UNLAWFUL CONSPIRACY

177.    The anticompetitive ends of this price-fixing scheme are readily apparent in Defendants' steadily increasing prices in the face of stagnant or declining demand. As demonstrated in Figure 1, below, Defendants have raised prices in virtual lock step every year since at least 2005, including in 2009, when one of the most uncertain economic times since the Great Depression caused dental patients to defer dental expenses and demand for dental services declined by 2%.



**Figure 1: Changes in Dental Supplies Demand versus Distributor List Prices**

178.    Defendants enjoy substantial net profit margins, with Patterson reaching a high of 11% in 2010 and 2011. These high net profit margins contrast sharply with the observed profit margins in other medical distribution sectors. For example, profit margins for the "big three" pharmaceutical distributors in the United States (McKesson, Cardinal Health, and AmerisourceBergen) range from 0.2% to 1.5% and the most recent quarterly profit margins are between 0.9% and 1.37%.

179.    As discussed in great detail in the Texas Attorney General's complaint against Benco, discussed *supra*, and the allegations, *infra*, the conspiracy was effectuated by the Cartel Members through low- and high-level employees of Defendants, including their CEOs and executives, regularly communicating with one another at private meetings, at professional events, and at personal gatherings, through text messages, phone calls, business and personnel

email messages, and through intermediaries.

## FRAUDULENT CONCEALMENT AND TOLLING

180.    Plaintiffs and members of the Class, through the exercise of reasonable diligence, could not have discovered Defendants' wrongful conduct or the resulting injury any sooner, because Defendants fraudulently concealed and affirmatively misled their customers as to their conduct and the resulting impact on prices paid by Plaintiffs and the members of the Class.

181.    By its very nature, the success of a conspiracy depends on the co-conspirators' concealment of its existence. Recognizing both the illegality of the conspiracy and the need to disguise its existence, Burkhart's Jack Bowers told Henry Schein's Mark Lowery and Dynamic Dental's Skip Pettus in 2008 that they "have to be very careful, if a customer doesn't like us, they could have us all up on price fixing. . . . Price fixing or—or somebody complaining about getting together as a group and saying: Okay, well, we're going to hold to a certain margin."

182.    Archer & White's August 31, 2012 lawsuit was the first publicly available information that Henry Schein had participated in an anticompetitive conspiracy.

183.    The Texas Attorney General's April 9, 2015 complaint was the first publicly available information that Benco had participated in an anticompetitive conspiracy.

184.    SourceOne's September 21, 2015 complaint was the first publicly available information that Patterson had participated in an anticompetitive conspiracy.

185.    Plaintiffs and the members of the Class could not through reasonable diligence have discovered the anticompetitive conspiracy at an earlier time due to the inherently self-concealing nature of the conduct as well as Cartel Members' efforts to conceal their conduct.

186.    As the Texas Attorney General noted, Benco and its co-conspirators employees "interact regularly in person, at various social gatherings, and industry or trade association meetings, and

remotely, through company email, personal email, personal cell phone calls, company cell phone

calls, and text messaging," providing them the opportunity—which they exercised—to conspire

without detection. For example, the President of Henry Schein and a Managing Director of

Benco communicate regularly via text message and in-person meetings.

187.    In 2013 and 2014, executives from Patterson and Henry Schein attended Barclays Global

Health Care Conference in Miami, Florida, offering an opportunity to conspire. A January 9,

2014 email puts high-level Patterson, Henry Schein, and Benco employees at a dinner together at

the "Ocean Club" where a topic suggested by a manufacturer's employee also to be in attendance

was "help[ing them] make [their] Bonus [sic] for 2014." Cartel Members also send

representatives to the annual trade shows of state dental associations (boycotts notwithstanding),

providing dozens of opportunities to conspire *every year*. In particular, Henry Schein, Patterson,

Benco, and Burkhart regularly attend Dental Trade Alliance meetings, a trade association of

distributors and manufacturers that is a hotbed for collusion.

188.    These distributors took other extreme efforts to avoid detection of their cartel. In an April

6, 2015 email, a Henry Schein employee wrote to a Benco employee: "My personal email is

[redacted]@hotmail.com. Let's take this conversation there." And in a July 21, 2014 email chain

between Patterson and Benco discussing "pulling [their] sponsorship and attendance of the

[Arizona] state meeting" as a result of the AZDA's affiliation with SourceOne, Patterson's

Daniel Reinhardt concludes: "Please discuss [this] live and no further emails." Patterson's Dave

Misiak gave a similar instruction to Patterson employees on the same day: "Please discuss live

and no emails on this topic." And in 2008, a Henry Schein manager gave instructions to keep

their price-fixing secret, "***to make it invisible with the customer because we don't want to

compromise that end of it and make it look like we are . . . having a big conspiracy going on***."

In January of 2012, the CEOs of Henry Schein and Patterson met for a personal lunch. On

September 30, 2013, shortly before the boycott of the TDA, Henry Schein's President Tim

Sullivan requested that Patterson's CEO Scott Anderson call him directly. And Patterson wrote

to a manufacturer in an October 25, 2013 email, "Sometimes these fights are better behind closed

doors and not with the sales force knowing." There is no conceivable way Plaintiffs or the

members of the Class, through the exercise of reasonable diligence, could have gained

knowledge of conspiratorial conduct undertaken through business email, personal email, text

messages, and phone conversations—with the ***stated intent*** of keeping the cartel "invisible [to]

the customer."

189.    Moreover, Henry Schein, Patterson, Benco, and Burkhart falsely reported to customers

that the yearly price increases were the result of increasing "shipping costs."

190.    Henry Schein, Patterson, Benco, and Burkhart also used code words, even among

themselves, to describe their price fixing scheme, such as "keeping the integrity of the margins."

## CLAIM FOR RELIEF

### COUNT ONE
### Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1
### Unlawful Conspiracy in Unreasonable Restraint of Trade

191.    Plaintiffs incorporate each allegation above as if fully set forth herein.

192.    Defendants and Burkhart are horizontal competitors that unlawfully agreed with one

another and acted in concert not to compete on price, including agreements to fix prices for

dental supplies and equipment, to allocate customers among themselves, and to boycott or

threaten to boycott market participants, including trade associations, manufacturers, and

customers that were or considered doing business with lower-priced rival distributors.

Defendants' and Burkhart's conduct constitutes an unlawful conspiracy that is *per se* unlawful.

193.    Defendants' and Burkhart's conspiracy has caused Plaintiffs and the Class antitrust injury in the form of payment of artificially inflated prices as a result of the conspiracy alleged herein. These injuries, in the form of payment of overcharges, are quintessential antitrust injuries flowing directly from the unlawful conduct alleged herein.

194.    There are no procompetitive justifications for Defendants' and Burkhart's conduct.  Even if there were such justifications, there are clear less restrictive alternatives to achieve them, and Defendants' and Burkhart's conduct unreasonably restrains trade.

## REQUESTS FOR RELIEF

Plaintiffs respectfully request the following relief:

A.    That the Court determine that the claims alleged herein are suitable for class treatment and certify the proposed Class pursuant to Federal Rule of Civil Procedure 23;

B.    That the Court appoint Plaintiffs as the representatives of the Class;

C.    That Plaintiffs' counsel be appointed as counsel for the Class;

D.    That Plaintiffs and the Class recover damages equal to the difference between the dental supplies and equipment distribution prices actually paid to Defendants and Burkhart and the competitive prices that would have prevailed in a market undistorted by Defendants' and Burkhart's unlawful conduct alleged herein, trebled;

E.    That Defendants be enjoined from engaging in further unlawful conduct;

F.    That Plaintiffs and the Class be awarded their costs of suit, including reasonable attorneys' fees and expert fees; and

G.    That Plaintiffs and the Class be awarded pre- and post-judgment interest on all sums awarded, and other relief as the Court deems necessary and justified.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all claims alleged herein so triable.

Dated: March 11, 2016                    Respectfully submitted,

*/s/ John Radice*
John Radice
Kenneth Pickle
RADICE LAW FIRM, P.C.
34 Sunset Blvd
Long Beach, NJ 08008
Tele: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com

*Liaison Class Counsel*

| | |
|---|---|
| Brent W. Landau<br>Gary I. Smith, Jr.<br>HAUSFELD LLP<br>325 Chestnut St., Suite 325<br>Philadelphia, PA 19106<br>Tele: (215) 985-3270<br>Fax:  (215) 985-3271<br>Email: blandau@hausfeld.com<br>Email: gsmith@hausfeld.com<br><br>Scott A. Martin<br>HAUSFELD LLP<br>33 Whitehall Street, 14th Floor<br>New York, NY 10004<br>Tele: (646) 357-1100<br>Fax:  (212) 202-4322<br>Email: smartin@hausfeld.com<br><br>Melinda R. Coolidge<br>HAUSFELD LLP<br>1700 K Street, NW<br>Washington, DC 20006<br>Tele: (202)-540-7200<br>Fax:  (202)-540-7201<br>Email: mcoolidge@hausfeld.com | Eric L. Cramer<br>Patrick Madden<br>Joshua Ripley<br>BERGER & MONTAGUE, P.C.<br>1622 Locust Street<br>Philadelphia, PA 19103<br>Tele: (215) 875-3000<br>Fax: (215) 875-4604<br>Email: ecramer@bm.net<br>Email: pmadden@bm.net<br>Email: jripley@bm.net<br><br>*Co-Lead Class Counsel* |

| *Co-Lead Class Counsel* | |
|---|---|
| William Christopher Carmody<br>Shawn J. Rabin<br>Arun Subramanian<br>SUSMAN GODFREY L.L.P<br>560 Lexington Avenue, 15th Fl.<br>New York, NY 10022<br>Tele: (212) 336-8330<br>Fax: (212) 336-8340<br>Email: bcarmody@susmangodfrey.com<br>Email: srabin@susmangodfrey.com<br>Email: asubramanian@susmangodfrey.com<br><br>Jonathan Jeffrey Ross<br>SUSMAN GODFREY LLP<br>1000 Louisiana<br>Suite 5100<br>Houston, TX 77002<br>713-651-9366<br>Fax: 713-654-6666<br>Email: jross@susmangodfrey.com<br><br>*Co-Lead Class Counsel* | Richard A. Koffman<br>Robert Cobbs<br>COHEN MILSTEIN SELLERS & TOLL PLLC<br>1100 New York Ave., NW, Suite 500<br>Washington, DC 20005<br>Tele: (202) 408-4600<br>Fax: (202) 408-4699<br>Email: rkoffman@cohenmilstein.com<br>Email: rcobbs@cohenmilstein.com<br><br>Christopher J. Cormier<br>COHEN MILSTEIN SELLERS & TOLL PLLC<br>2443 S. University Blvd., #232<br>Denver, CO 80210<br>Tele: (720) 583-0650<br>Email: ccormier@cohenmilstein.com<br><br>*Co-Lead Class Counsel* |