```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
                                                            :
                                                            :
                                                            :   **MEMORANDUM**
In re DENTAL SUPPLIES ANTITRUST                             :   **DECISION & ORDER**
         LITIGATION                                         :
                                                            :   16 Civ. 696 (BMC)
                                                            :
                                                            :   **ALL CASES**
                                                            :
----------------------------------------------------------- X
```

**COGAN**, District Judge.

Before me are defendants' individually filed motions to dismiss plaintiffs' Consolidated Class Action Complaint ("CCAC"). The question is whether plaintiffs' complaint, which alleges a conspiracy comprised of three interrelated but distinct components, plausibly states a claim for a nationwide conspiracy to fix prices. Plaintiffs allege that defendants have violated Section 1 of the Sherman Act by acting together to suppress price competition nationwide for the distribution of dental supplies. Defendants contend that the allegations are based on cherry-picked events and statements, removed from their original context, and reassembled into a conspiracy, whereas the actual context shows it is not the most plausible portrayal of the events. I conclude, to the contrary, that defendants' efforts to have me disassemble plaintiffs' theory and reassemble it in the manner that defendants' request is inappropriate on a Rule 12(b)(6) motion, and therefore deny defendants' motions.

## SUMMARY OF COMPLAINT

The following facts are based upon allegations in the CCAC. The allegations are assumed to be true solely for purposes of the present motion.[1]

### A. The Parties

Plaintiffs are a group of dental practices and dentists. Defendants are the three largest distributors of dental supplies and equipment in the United States. They collectively control roughly 80% to 90% of the market; defendant Henry Schein currently holds 41% of the market, defendant Patterson holds 34%, and defendant Benco has approximately 10%. The CCAC alleges that defendants have engaged in conduct that has led to higher prices for dental supplies, eliminating competition between themselves, and thereby keeping their profit margins artificially high. The CCAC alleges a *per se* illegal agreement not to compete on price. The agreement was implemented through three separate mechanisms: margin and price fixing; an anti-poaching agreement; and group boycotts. Through these mechanisms, defendants blocked entry to the market for new competitors who would have charged lower prices for dental supplies and taken market share from defendants.

### B. Margin and Price Fixing

Defendants had an agreement not to compete on price so as to artificially inflate prices and maintain high margins. As far back as 2005, defendants agreed to charge margins on dental supplies and equipment between 26% and 28%. Defendants have raised these margins every year, and currently the cartelized margins are 35% or higher.

---

[1] The CCAC is 60 pages long. Because I am only briefly summarizing it here, it may appear that the complaint is conclusory, but it actually contains quite a lot of specific factual detail.

The complaint describes specific efforts undertaken by Henry Schein and non-defendant Burkhart in June 2008 to force their competitors, Archer & White and Dynamic Dental, to charge similar margins. This includes detailed allegations about meetings and other communications about margins. For example, Archer & White's representative, Skip Pettus, asked Henry Schein's representative, Mark Lowery, whether Archer & White could stay in existence if it raised its prices. In response, Lowery told Pettus "What – what we don't want to do is come across [as] dictating the price to the end user. That will get us in a lawsuit. Guarantee it. But you know, a couple of things. One is I think when everyone plays on the same field, it makes things a lot easier." The conversation continued in the same vein. At one point, Pettus was given specific guidance as to how high Archer & White's margins should be to fall in line with other distributors in the industry. These discussions are mirrored in other conversations and correspondence regarding the margins defendants sought to maintain.

Additionally, in August 2012, Archer & White filed suit against Henry Schein alleging price fixing. Prior to the filing of the case, the head of Benco called James Archer, head of Archer & White, and offered him $1 million to settle the case. Benco, although not a party to the lawsuit, told Archer & White that it "will not work for Benco on a lot of different levels."

**C. Anti-Poaching Agreement**

In an effort to further their agreement not to compete on price, defendants also agreed not to try and poach each other's sales employees. For example, in February and March 2012, the President of Henry Schein and a Managing Director of Benco exchanged text messages regarding Benco's hiring of a former Henry Schein sales representative. Benco's employee wrote, "We agreed that she would sit even though she didn't have a contract. And she did sit, even longer than the agreement says. We never talked about whether she counts toward the

limit." A representative of Benco described the agreement as an ongoing "gentlemen's agreement" not to actively recruit one another's sales representatives.

**D. Market Boycott**

Defendants exerted pressure on manufacturers of dental supplies, as well as other industry players, to prevent their competitors from entering the market and trying to undercut them with lower prices. For example, from 2004 through 2008, Archer & White was a relatively small, but growing, competitor of defendants because it offered the same products at lower prices and with better service. Defendants Henry Schein and Patterson applied pressure on equipment manufacturers like Midmark to prevent it from selling its products to Archer & White. Similar pressure was exerted on manufacturer Pelton & Crane by Henry Schein and non-defendant Burkhart in January 2008, and manufacturer Instrumentarium in March and April 2009. This pressure was exerted across the industry and the CCAC sets forth specific allegations detailing which defendants were involved in which specific boycott.

There was also a concerted effort to boycott SourceOne – a new distributor with a wide-range product offering – that created a dental supplies distribution platform in partnership with the Texas Dental Association ("TDA"). Defendants threatened manufacturers to prevent them from selling to SourceOne and also boycotted the annual meetings and trade shows of state dental associations that were partnering or doing business with SourceOne. Defendants Patterson and Henry Schein told TDA representatives that unless TDA ended its relationship with SourceOne, they would refuse to attend the annual trade show and refuse to advertise in TDA's publications. When TDA associates refused to back down, defendants boycotted the trade show TDA had organized in 2014, as well as one organized by the Arizona Dental Association in 2015.

4

These boycotts had a substantial effect on other state dental associations. In January 2015, the Colorado Dental Association told SourceOne it was "concerned about the major dental suppliers in our area, Schein, Patterson and others pulling their support" if it associated with SourceOne. Defendants agreed to boycott dentists who bought supplies from SourceOne by withholding service and repairs for installed equipment. These boycotts were the product of concerted action by defendants after discussions amongst themselves about the threat posed by SourceOne.

## DISCUSSION

I. **Legal Standard**

   A. Rule 12(b)(6)

To defeat a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1973 (2007)). The Supreme Court has defined the standard on a motion to dismiss for failure to state a claim as a "two-pronged approach." Id. at 679. First, a court must construe a complaint's factual allegations as true, but should not consider legal conclusions. Id. at 678. Second, a court must determine whether the complaint "states a plausible claim for relief," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

Thus, in order to defeat a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" Id. at 678 (citing Twombly, 550 U.S. at 547, 127 S. Ct. at 1973). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted). Therefore, the "plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citation omitted).

In considering whether to dismiss a complaint under Rule 12(b)(6), the court is "generally limited to the facts as presented within the four corners of the complaint, to documents attached to the complaint, or to documents incorporated within the complaint by reference." Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002). In addition, there is a narrow exception allowing a court to consider "a document upon which [the complaint] *solely* relies and which is *integral to the complaint*." Roth v. Jennings, 489 F.3d 499, 509-10 (2d Cir. 2007) (emphasis and alteration in original). A mere passing reference or even more substantial references, however, to a document outside the complaint does not, on its own, incorporate the document into the complaint itself. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004).

B. Section 1 of the Sherman Act

Section 1 of the Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states." 15 U.S.C. § 1. The central inquiry in a Section 1 case is whether the alleged conduct "stems from independent decision or from an agreement, tacit or express." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010 ). To sustain a Section 1 conspiracy claim, a complaint must allege facts that show "joint or concerted action" that "reveal[s] a 'unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" Anderson News L.L.C. v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) (quoting Monsanto Co. v. Spray-

6

Rite Service Corp., 465 U.S. 752, 761, 104 S. Ct. 1464, 1471 (1984)).  Absent a specific allegation of fraud, antitrust claims must satisfy Rule 8 and not the heightened pleading standard of Rule 9(b).  See, e.g., Twombly, 550 U.S. at 569 n. 14.

In particular, a complaint must "allege enough facts to support the inference that a conspiracy actually existed" by either direct or circumstantial evidence, because "in many antitrust cases" a "'smoking gun' can be hard to come by, especially at the pleading stage." Mayor & City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013). Asking for plausible grounds to infer an agreement simply calls for enough facts to establish a reasonable expectation that discovery will reveal evidence of illegal agreement.  See Twombly, 550 U.S. at 556.  Further, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action."  Anderson News, 680 F.3d at 184.  The choice between two plausible inferences that may be drawn from factual allegations is not a choice for the Court to make on a Rule 12(b)(6) motion.  "[T]he plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct.  Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible." Id. at 189-90; see also Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001).

**II.     Analysis**

Plaintiffs have sufficiently alleged that defendants orchestrated a single interconnected nationwide conspiracy not to compete on price with the common goal of driving up margins and preventing competitive upstarts from gaining a larger share of the market.  Plaintiffs' complaint,

7

contrary to defendants' arguments, is not made up of a series of disjointed allegations. Instead, the CCAC alleges that defendants would systematically pressure rivals by threatening them that if they continued to sell dental supplies with low margins, defendants would use their collective market power to coerce manufacturers not to sell to them. Defendants put this threat into action when necessary, as evidenced by their boycott of SourceOne. Whether or not plaintiffs will be able to prove such a conspiracy is a question for a later date, but the mere fact that defendants have a different case theory should not deprive plaintiffs of their opportunity to proceed. See In re Air Cargo Shipping Servs. Antitrust Litig., No. 06 MD 1775, 2014 WL 7882100, at *38 (E.D.N.Y. Oct. 15, 2014), report and recommendation adopted, No. 06 MD 1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

The CCAC provides numerous specific factual allegations that tend to show that defendants were working in concert, not independently, to influence the market. For example, in 2009, Scican Dental, a manufacturer of dental instruments, cut off its supply to Archer & White after it received threats from both Henry Schein and Patterson to stop doing business with their competitor. The description of the joint efforts by defendants to organize boycotts of various dental association trade shows, which plaintiffs allege with reference to specific trade shows and communications, further supports this conspiracy. Plaintiffs have adequately alleged that each defendant agreed to take part in, and actively participated in the conspiracy. Further, every defendant need not have taken part in each aspect of the conspiracy for plaintiffs' to allege an agreement. See Hinds Cnty., Miss. v. Wachovia Bank N.A., 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010).

Defendants are correct that some portions of plaintiffs' CCAC, such as the anti-poaching agreement, are less developed at this stage than others. Plaintiffs' CCAC alleges that an

agreement amongst defendants not to poach each other's sales representatives was another means by which defendants sought to keep margins steady and high.  This particular allegation has minimal detail, and that detail only involves Benco and Henry Schein.  Nonetheless, the allegations in the CCAC in its entirety are enough to merit further exploration through discovery.

Defendants Patterson and Benco urge me to look beyond the four-corners of the CCAC to documents and recorded conversations that are referenced in the CCAC, as well as documents not referenced in the complaint that they argue show plaintiffs' allegations are not plausible.  To the extent that plaintiffs' complaint explicitly references certain conversations or documents, those materials are incorporated by reference, and I have reviewed them for the purposes of this motion.  Based on my review, I find that the allegations made in the complaint, which rely upon these outside materials, are sufficiently plausible to defeat a motion to dismiss.   Although there are multiple plausible inferences that one could possibly draw from certain documents, plaintiffs' allegations are reasonably rooted within the materials.

I reject defendants' attempt to put materials that plaintiffs did not rely upon in drafting their complaint before me at this juncture.  Much of defendants' argument can be reduced to a contention that by looking to these additional materials there is another, more plausible, inference for certain conduct.  However, for plaintiffs to adequately allege a Section 1 claim, they merely need to allege behavior that could plausibly create inferences of anti-competitive conduct.  For example, Benco attempts to put forward a plausible explanation for why it offered to settle Archer & White's lawsuit against Henry Schein.  Benco is essentially asking me to weigh competing inferences and find one more persuasive than another.  After discovery has concluded, if the parties move for summary judgment, I may have occasion to find that no reasonable jury could accept plaintiff's interpretation of defendants' conduct.  But until that time,

9

at least, it would be improper to accept defendants' theory over plaintiffs' – even if plaintiffs' theory is based on a selective or limited view of the facts. Like it or not, Rule 8 gives plaintiffs the ability to be selective in choosing which facts to present in their complaint.

I recognize the possibility that plaintiffs have mischaracterized certain statements quoted in the CCAC. For example, in support of their allegation that defendants told industry participants that they wanted to be on an "equal playing field" for their margins, plaintiffs quote a Benco email from April 8, 2015, in which the author was discussing a manufacturer's decision to recognize Patterson as an authorized dealer of its products. Plaintiffs quote an excerpt stating that "the competition [with Patterson for sales of that manufacturers' products] will be fair." The implication is that defendants will not be competing with one another on price. Instead, the sentence reads in its entirety, "I believe the competition will be fair to secure orders and I know the level of support we will get from the [manufacturer's] . . . teams will meet our expectations." The email concludes with the author urging Benco employees to "use this as a positive move and make it a BAD DAY for the 'P' company."

The difference between the quoted language and that contained in the CCAC may prove relevant. The full text of the email certainly provides helpful context to understand the relationship between Benco and Patterson. However, plaintiffs' reading of the email, that competition between Benco and Patterson "will be fair," can be placed in the broader context of events unfolding in the industry as a whole at this time, such as the dental boycotts. It is plausible, for pleading purposes, to read this email as reflecting Benco's internal expectation that it would not face a vigorous price competition with Patterson for customer orders.

The foregoing discussion pertains to arguments generally advanced by all defendants. There are other arguments that pertain to each individually. I have considered those, but reject them as well.

Patterson argues that plaintiffs' CCAC only implicates it in the boycotts undertaken to prevent SourceOne and other competitors from entering the market. Patterson contends that these limited factual allegations alone do not support and make plausible its conscious commitment to participate in a much broader conspiracy.

Patterson, however, is plausibly implicated in the margin fixing allegations. Plaintiffs make allegations that implicate Patterson, with reference to specific communications and conversations, such as: (1) competition from Patterson with Benco for customers "will be fair;" (2) a question from Archer & White's representative in a conversation about price margins asking how to be accepted into the market "just like a [Burkhart] or Patterson is"; (3) a comment from Henry Schein's representative, "If we're both quoting a deal, let's make sure that we're both getting the same thing . . . . And you're selling it, if you're not going to be selling it, Jack [Burkhart] is going to be selling it, [or] Patterson's going to be selling it . . . . but I just want to make sure we're all on the same page," and not "slugging it out and killing each other on margins [prices]." (brackets in CCAC version) These allegations create a plausible inference that Patterson was aware of and therefore participating in the agreement to keep margins at certain levels, especially in the context of its behavior with both the dental association boycotts and the pressure exerted on manufacturers like Instrumentarium, and that it acted to maintain its margins at those same levels.

Benco, which has the smallest market share of any defendant, argues that there are no facts to plausibly connect it to a conspiracy to fix margins or to the existence of an alleged no-

poaching agreement. Benco, however, is plausibly implicated in both the margin fixing and no-poaching agreement, as well as the larger conspiracy. Benco, as noted above, attempted to explain its offer to settle a case brought by Archer & White against Henry Schein alleging price fixing and exclusionary group boycotting activities, even though it had no direct interest in the lawsuit. One plausible interpretation of Benco's actions is that it intervened to protect the cartel because otherwise, it would make little sense for it to indemnify its rivals for the consequences of their illegal conduct. In addition, a Benco employee also wrote an email stating that competition "would be fair to secure orders" between it and Patterson. This email is subject to interpretation, but it is plausible that Benco was acknowledging that as a result of the conspiracy, the competition would be civil and not unduly harmful to either company's competitive interests.

One of Benco's Managing Directors exchanged text messages with the President of Henry Schein about the hiring of a former Henry Schein sales representative. One plausible interpretation is that there was an agreement not to actively recruit one another's representatives as a means of reducing overall competition for customers. Because customers are often loyal to a particular sales representative, especially in a market with fairly steady prices, if a particular company poaches a representative, customers may follow. This allegation supports the overall conspiracy alleged in the CCAC.

I have considered all of the other arguments raised by defendants as to the allegations against them individually, and find that although some are strong and some are weak, the complaint in its totality states a claim as to each defendant.

## CONCLUSION

The motions to dismiss are denied.

**SO ORDERED.**

                                                *Digitally signed by Brian M. Cogan*

                                                            U.S.D.J.

Dated: Brooklyn, New York
         September 26, 2016